[No. S030310. May 16, 1994.]

In re CHRISTIAN S., a Person Coming Under the Juvenile Court Law. THE PEOPLE, Plaintiff and Respondent, v. CHRISTIAN S., Defendant and Appellant.

**COUNSEL**

Stephen Gilbert, under appointment by the Supeme Court, for Defendant and Appellant.

Fern M. Laethem, State Public Defender, Philip M. Brooks, Deputy State Public Defender, Ronald Y. Butler, Public Defender (Orange), Carl C. Holmes, Chief Deputy Public Defender, Deborah Ann Kwast, Assistant Public Defender, Thomas Havlena, Marri Derby, Deputy Public Defenders, Jeff Brown, Public Defender (San Francisco), Michael Willemson, Michael Satris, Kat Kozik, John T. Philipsborn, Kent S. Scheidegger, Veronica L. Gray, Jennifer L. Keller, Kristin A. Erickson, Andrea Taylor Gee and Gary M. Mandinach as Amici Curiae on behalf of Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pat Zaharopoulos, Garrett Beaumont, Louis R. Hanoian and Keith I. Motley, Deputy Attorneys General, for Plaintiff and Respondent.

John J. Meehan, District Attorney (Alameda), Thomas J. Orloff, Chief Assistant District Attorney, William M. Baldwin, Assistant District Attorney, and Jeff Rubin, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually,* but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter. The question is whether the Legislature abrogated this doctrine in 1981 by amending the Penal Code to eliminate the diminished capacity defense. We hold the doctrine of imperfect self-defense was not abolished.

The 1981 amendments to Penal Code sections 28, 29, and 188 do not manifest the Legislature's intention to mandate a murder conviction for a person who actually but unreasonably believes he must use lethal force to defend himself against imminent death or great bodily injury. Those amendments were a direct response to the public outcry against the diminished capacity defense successfully used in the infamous trial of a San Francisco City and County supervisor who had killed the city's mayor and another supervisor. That case raised no question of self-defense. Nothing in the language, history, or context of the amendments compels the conclusion that the Legislature intended to abrogate the well-established doctrine of imperfect self-defense—a doctrine that differs significantly from the doctrine of diminished capacity.

## FACTS

Christian S., a minor, seeks review of a judgment making him a ward of the juvenile court after sustaining a petition (Welf. & Inst. Code, § 602) charging him with the second degree murder of Robert Elliott (Elliott). Because we shall determine only a question of law and remand for further proceedings, extended factual recitation is unnecessary.

Briefly stated, the evidence shows that Elliott was a so-called skinhead and a possible gang member. After being physically and verbally harassed and threatened by Elliott's friends for about a year, Christian (hereafter, defendant) began to carry a handgun. Elliott, who blamed defendant for damaging Elliott's truck, chased defendant down the beach one day, repeatedly threatening "to get him" and challenging him to fire his weapon. Elliott halted his advance each time defendant pointed his gun at Elliott. Finally, after some additional taunting by Elliott, defendant shot and killed Elliott from a range of at least 20 feet.

Challenging the ensuing murder charge, defendant raised claims of self-defense (Pen. Code, § 197) and heat of passion or provocation (Pen. Code, § 192, subd. (a)), and contended the doctrine of imperfect self-defense negated malice, thereby reducing his offense to voluntary manslaughter. The trial court rejected all the defenses, concluding defendant had committed a killing that, if committed by an adult, would have constituted second degree murder. The court made no formal findings at the time of its ruling, but it implicitly found inadequate provocation or heat of passion for a voluntary manslaughter finding. And, although the court also rejected the claims of self-defense and imperfect self-defense, we cannot determine from the record whether the court rejected imperfect self-defense on the ground that the doctrine was no longer a tenable legal doctrine in any case or on the fact-based ground that defendant had no actual belief in the need for self-defense so that the doctrine did not apply in this case.

The Court of Appeal reversed. It ruled that the record "unequivocally established" that when defendant fired the gun, he feared that Elliott was about to "seriously" harm him. The court also interpreted the record as reflecting that the trial court had found that defendant had acted with an "honest belief" in the need to defend himself. The Court of Appeal held the Legislature had not abrogated the doctrine of imperfect self-defense and that, applying the doctrine, defendant's state of mind—that is, his honest belief— negated any finding that defendant acted with malice. In light of its decision, the Court of Appeal did not reach defendant's additional claims on appeal, namely, whether the trial court erred (1) in finding inadequate provocation

to support a "heat of passion" defense that would reduce the offense to voluntary manslaughter (Pen. Code, § 192, subd. (a)), and (2) in refusing to allow expert testimony regarding the so-called fight-or-flight syndrome.

DISCUSSION

1. *Status of imperfect self-defense and diminished capacity doctrines in 1981*

"Murder is the unlawful killing of a human being, or a fetus, *with* malice aforethought." (Pen. Code, § 187, subd. (a), italics added.) By contrast, "Manslaughter is the unlawful killing of a human being *without* malice." (Pen. Code, § 192, italics added.) "The vice is the element of malice; in its absence the level of guilt must decline." (*People* v. *Flannel* (1979) 25 Cal.3d 668, 680 [160 Cal.Rptr. 84, 603 P.2d 1] [*Flannel*].) The doctrines of imperfect self-defense and diminished capacity arose from this principle.

We explained imperfect self-defense in *Flannel, supra,* 25 Cal.3d 668. "It is the honest belief of imminent peril that negates malice in a case of complete self-defense; the reasonableness of the belief simply goes to the justification for the killing." (*Id.,* at p. 679.) We concluded that "An *honest but unreasonable* belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice. aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter." (*Id.,* at p. 674, some italics omitted.) (Although *Flannel* and other opinions referred to an "honest belief" we shall use the more precise term *"actual belief"* because it avoids the confusing. suggestion inherent in the phrase "honest belief" that a person could have a "dishonest belief," i. e., that a person could believe something he does not believe.)[1]

This principle had common law antecedents (*Flannel, supra,* 25 Cal.3d at p. 679) but was not a purely common law defense. Rather, because malice is a *statutory* requirement for a murder conviction (Pen. Code, § 187, subd. (a)), the statute required courts to determine whether an actual but unreasonable belief in the imminent need for self-defense rose to the level of

---

[1]It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. (See generally, 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, § 245, p. 280; 2 Robinson, Criminal Law Defenses (1984) § 131(b)(2), pp. 74-75.) It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense.

malice within the statutory definition. The doctrine thus had statutory as well as common law roots.

We observed in *Flannel, supra,* 25 Cal.3d 668, 681, that the doctrine had been "obfuscated by infrequent reference and inadequate elucidation" and thus, before the trial in that case, had not become a general principle of law requiring a sua sponte instruction. More important for our present purpose, though, is *Flannel*'s conclusion that in future cases imperfect self-defense would be deemed to be so well-established a doctrine that it "should be considered a general principle for purposes of jury instruction." (*Id.,* at p. 682.) Thus, by 1981 imperfect self-defense was demonstrably and firmly established.

Diminished capacity was also well established by that time. "[M]alice aforethought could be negated by showing that a person who intentionally killed was incapable of harboring malice aforethought because of a mental disease or defect or intoxication. [Citation.] To explain how diminished capacity negated malice, we redefined and expanded the mental component of malice aforethought beyond that stated in [Penal Code] section 188 to include a requirement that the defendant was able to comprehend the duty society places on all persons to act within the law, i.e., that he had an 'awareness of the obligation to act within the general body of laws regulating society.' " (*People* v. *Saille* (1991) 54 Cal.3d 1103, 1110 [2 Cal.Rptr.2d 364, 820 P.2d 588], fn. omitted, quoting *People* v. *Conley* (1966) 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911].) Absent this awareness by the defendant, a court could not find malice.

Because imperfect self-defense and diminished capacity were firmly established by 1981, we assume the Legislature was aware of both doctrines and would have made clear any intent to abolish either doctrine. (*Mesler* v. *Bragg Management Co.* (1985) 39 Cal.3d 290, 303 [216 Cal.Rptr. 443, 702 P.2d 601]; *Estate of McDill* (1975) 14 Cal.3d 831, 839 [122 Cal.Rptr. 754, 537 P.2d 874].)

## 2. *The statutory amendments*

The language and history of the 1981 Penal Code amendments leave no question that the Legislature intended to abolish the diminished-capacity defense. The Legislature explicitly and repeatedly stated that it was doing so. Conspicuously absent, however, is any similarly clear indication the Legislature also intended to eliminate imperfect self-defense.

### A. *The language*

"We begin with the fundamental rule that our primary task in construing a statute is to determine the Legislature's intent." (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) We

must begin with the words of the statute. (*Ibid.*) Several amendments were enacted together as part of Senate Bill No. 54. Those amendments included the addition to the Penal Code of section 28, which eliminated the diminished-capacity defense, and section 29, which limited psychiatric testimony regarding a defendant's mental state. The Legislature also changed Penal Code section 189's definition of premeditation and deliberation and amended section 22 to restrict a defendant's use of evidence of voluntary intoxication to negate mental capacity.

None of these amendments contains a single reference to imperfect self-defense. Rather, they show that the Legislature referred specifically to the defenses and types of evidence that were being eliminated or restricted. For example, Penal Code section 28, subdivision (b) states, "As a matter of public policy there shall be no defense of *diminished capacity, diminished responsibility, or irresistible impulse* in a criminal action or juvenile adjudication hearing." (Italics added.) The most reasonable inference to be drawn from the absence in these amendments of any reference to imperfect self-defense is that the Legislature intended no change in that doctrine, much less its abrogation.

Penal Code section 188, the statute on which respondent primarily relies, is likewise devoid of any reference to imperfect self-defense. Before the 1981 amendments, section 188 stated: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." The 1981 amendments did not change this language. Rather, the amendments added the following language: "When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. An *awareness of the obligation to act within the general body of laws regulating society* is not included within the definition of malice." (Stats. 1981, ch. 404, § 6, p. 1593, italics added.) This new language clearly refers to the diminished-capacity defense. The amendment uses the same language we used before 1981 in explaining the premise that malice required an ". . . *awareness of the obligation to act within the general body of laws regulating society* . . . ." (*People* v. *Conley, supra,* 64 Cal.2d 310, 322, italics added.) The Legislature made absolutely clear its intent to abrogate the diminished-capacity defense.

There is no similar reference to imperfect self-defense in the 1981 amendment to Penal Code section 188. We decline to insert into the statute what the Legislature omitted. That is not our function.

Respondent seems to suggest, however, that the doctrines of diminished capacity and imperfect self-defense were so closely related that, when the Legislature abrogated the former in 1981, it must have acted, albeit silently and perhaps inadvertently, to eliminate imperfect self-defense as well. We disagree.

First, we are aware of no authority that supports the notion of legislation by accident. If respondent means the Legislature abrogated imperfect self-defense by implication, we reject that view as well. "[A]n intention to legislate by implication is not to be presumed." (*First M. E. Church* v. *Los Angeles Co.* (1928) 204 Cal. 201, 204 [267 P. 703]; *Educational & Recreational Services, Inc.* v. *Pasadena Unified Sch. Dist.* (1977) 65 Cal.App.3d 775, 782 [135 Cal.Rptr. 594].)

Second, respondent reads too much into the discussion in *Flannel, supra,* 25 Cal.3d 668, of mental capacity, as it had been construed and applied in *People* v. *Conley, supra,* 64 Cal.2d 310, 322. Although "*Flannel*[, *supra,* 25 Cal.3d 668] relied upon the expanded mental component of malice in formulating its imperfect self-defense doctrine, its reliance was only *partial.* Independent of this expanded mental component and independent of diminished capacity, *Flannel* regarded imperfect self-defense as a factor which —just like 'the statutorily suggested "sudden quarrel or heat of passion" —can negate malice aforethought. . . .'" (*People* v. *De Leon* (1992) 10 Cal.App.4th 815, 822 [12 Cal.Rptr.2d 825], quoting *Flannel, supra,* 25 Cal.3d 668, 672.) The *De Leon* court's observation was well taken. The doctrine of imperfect self-defense had a lineage independent of the notion of mental capacity set forth in *Conley, supra,* 64 Cal.2d 310. In *Flannel* itself, *supra,* 25 Cal.3d 668, we traced the long development of the doctrine in California courts. (*People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Lewis* (1960) 186 Cal.App.2d 585 [9 Cal.Rptr. 263]; *Roads* v. *Superior Court* (1969) 275 Cal.App.2d 593 [80 Cal.Rptr. 169]; *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913].) Indeed, 30 years before the diminished-capacity defense was allowed, a California court approved the imperfect self-defense doctrine: " '[I]f the act is committed under the influence of an uncontrollable fear of death or great bodily harm, caused by the circumstances, but without the presence of all the ingredients necessary to excuse the act on the ground of self-defense, the killing is manslaughter' [citation]." (*People* v. *Best* (1936) 13 Cal.App.2d 606, 610 [57 P.2d 168].) Several other states also had approved the imperfect self-defense doctrine long before the notion of diminished capacity was approved in *Conley, supra,* 66 Cal.2d 310, 322. (*Allison* v. *State* (1905) 74 Ark. 444 [86 S.W. 409]; *State* v. *Clark* (1904) 69 Kan. 347 [77 P. 287]; *Commonwealth* v. *Colandro* (1911) 231 Pa. 343 [80 A. 571]; *State* v. *Swift* (1926) 53 N.D. 916

[208 N.W. 388]; *State* v. *Foutch* (1896) 95 Tenn. 711 [34 S.W. 423]; *State* v. *Kidd* (1918) 24 N.M. 572 [175 P. 772]; *Hartfield* v. *State* (1936) 176 Miss. 776 [170 So. 531].)[2]

Put simply, as the *De Leon* court, *supra*, 10 Cal.App.4th 815, correctly observed, *Flannel, supra*, 25 Cal.3d 668, had two *independent* premises: (1) the notion of mental capacity set forth in *Conley, supra*, 64 Cal.2d 310, 322, and (2) a grounding in both well-developed common law and in the statutory requirement of malice (Pen. Code, § 187). The 1981 amendments make clear the Legislature intended to eliminate the notion of diminished capacity. Thus, that part of the reasoning in *Flannel, supra*, 25 Cal.3d 668, is no longer valid. But, *Flannel*'s other premise was not affected by the amendments.

Third, despite the discussion in *Flannel, supra*, 25 Cal.3d 668, of mental capacity, neither that opinion nor the other cases approving imperfect self-defense could have misled the Legislature into reasonably believing that the doctrine was the same as, or even inextricably bound up with, the diminished-capacity defense. We made clear in *Flannel* that the two doctrines were not coextensive: "We disagree that the doctrine of unreasonable belief is necessarily bound up with or limited by the concepts of either heat of passion *or diminished capacity.*" (*Flannel, supra*, 25 Cal.3d 668, 677, italics added.) The Legislature was, of course, aware of *Flannel* and thus knew that we had noted the difference between the two doctrines. We are not persuaded the Legislature would have attempted to eliminate imperfect self-defense by referring only to the diminished-capacity defense in the amendment to Penal Code section 188. (We subsequently reiterated the distinction between the two doctrines when we concluded in *People* v. *Saille, supra*, 54 Cal.3d 1103 (*Saille*), that the Legislature had abrogated the diminished-capacity defense. Concerning imperfect self-defense, we observed, *"This doctrine has no application to the facts before us . . . ."* (*Id.,* at p. 1107, fn. 1, italics added).)

Fourth, even if we had not emphasized the difference between the two doctrines, that difference would have been patent, and we assume the Legislature would have understood this. The two doctrines relate to the concept of malice, but the similarity ends there. Unlike diminished capacity, imperfect self-defense is not rooted in any notion of mental capacity or

---

[2]As another state's high court has more recently observed, a majority of those states that have considered the doctrine of imperfect self-defense has approved the doctrine. (*State* v. *Faulkner* (1984) 301 Md. 482 [483 A.2d 759]; see also *People* v. *Guest* (1986) 115 Ill.2d 72 [104 Ill.Dec. 698, 503 N.E.2d 255]; *Wood* v. *State* (Okla.Crim.App. 1971) 486 P.2d 750; *State* v. *Mendoza* (1977) 80 Wis.2d 122 [258 N.W.2d 260].)

awareness of the need to act lawfully. To the contrary, a person may be entirely free of any mental disease, defect, or intoxication and may be fully aware of the need to act lawfully—and thus not have a diminished capacity—but actually, although unreasonably, believe in the need for self-defense. Put simply, an awareness of the need to act lawfully does not—in fact or logic—depend on whether the putative victim's belief in the need for self-defense is correct. A person who actually believes in the need for self-defense necessarily believes he is acting lawfully. He is thus aware of the obligation to act lawfully. A defendant could assert one doctrine even though the facts did not support the other. The diminished-capacity defense could be—and often has been—asserted when self-defense was not an issue; and, conversely, imperfect self-defense could be raised when there was no claim of diminished capacity.

▪ In short, respondent fails to persuade us that the doctrines of diminished capacity and imperfect self-defense were so closely related that the Legislature believed its elimination of diminished capacity also would abrogate, silently but necessarily, the doctrine of imperfect self-defense. The Legislature did not refer to imperfect self-defense. *The language added to Penal Code section 188 by the 1981 amendments did not eliminate imperfect self-defense.*

The question then is whether Penal Code section 188's pre-1981 definition of malice mandates a finding of malice (and thus murder) when a person kills with an actual but unreasonable belief in the need for self-defense against imminent death or great bodily injury. Section 188 states, "It [malice] is express when there is manifested a deliberate *intention unlawfully to take away the life* of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Italics added.)

This inartful language leads to two conflicting views of Penal Code section 188's definition of express malice. Defendant contends the word "unlawfully" modifies the word "intention" so that the statute requires an intent to act unlawfully or, put in everyday language, the defendant must have a wrongful intent. Taking a different view, respondent construes the definition of express malice to mean that "unlawfully" refers not to the defendant's intent, but only to whether the act is later found to be unlawful. That is, the defendant need not have intended to act unlawfully. Rather, he need only to have intended to kill. Even if he *intended* to act lawfully, he had express malice and thus committed murder if the killing is later found to be unlawful.

We believe defendant's construction of the statute is the more reasonable. Respondent's approach substitutes an unlawful consequence for an unlawful

intent. This view also reverses the normal way in which malice and murder are understood. As respondent would have it, if a person kills someone lawfully, the killer has no malice, but if he kills someone unlawfully, he has malice. Of course, whether the killing *is* unlawful is the ultimate question and can be determined only with hindsight. Thus, under respondent's view, the defendant's mental state at the time of the killing will depend on whether the killing is later determined to be unlawful. The defendant's intent would become—not a fact to be determined—but the result of a determination of whether he acted unlawfully.[3]

We also reject the suggestion that we previously decided in *Saille, supra,* 54 Cal.3d 1103, that Penal Code section 188's definition of express malice does not require an *intent* to act unlawfully. This reads too much into *Saille.* It quotes a Court of Appeal decision that, in turn, relies on another Court of Appeal decision for the proposition that, " 'The adverb "unlawfully" in the express malice definition means simply that there is no justification, excuse, or mitigation for the killing recognized by the law.' " (*Saille, supra,* 54 Cal.3d at p. 1115, quoting *People* v. *Bobo* (1990) 229 Cal.App.3d 1417, 1440-1441 [271 Cal.Rptr. 277], citing *People* v. *Stress* (1988) 205 Cal.App.3d 1259, 1268 [252 Cal.Rptr. 913].) Respondent asserts this observation is inconsistent with the doctrine of imperfect self-defense. Not so. In its very next sentence after the one quoted in *Saille, supra,* 54 Cal.3d at page 1115, the *Bobo* court, *supra,* 229 Cal.App.3d at page 1441, explained, "Thus, in the wake of the 1981 legislation, voluntary manslaughter encompasses only an intentional killing resulting from a sudden quarrel or heat of passion (with adequate provocation), and *perhaps a killing arising from an honest but unreasonable belief in the need to defend.*" (*Bobo, supra,* 229 Cal.App.3d 1417, 1441, italics added.) Even the *Bobo* court itself did not suggest that its view of section 188's express malice definition would necessarily prohibit imperfect self-defense. Indeed, the court made clear it was not suggesting as much. The passing reference in *Saille, supra,* 54 Cal.3d 1103, to this equivocal observation in *Bobo, supra,* 229 Cal.App.3d 1417, is too slender a reed on which to base the conclusion that *Saille* decided the issue now before us. Indeed, the *Saille* court made clear it was not deciding this issue: "That [imperfect self-defense] doctrine applies to reduce an intentional killing from murder to manslaughter when a person kills under an honest [i.e.,

---

[3]We emphasize that our discussion of this point is limited to the context of a claim of imperfect self-defense, which is based on a defendant's assertion that he lacked malice under Penal Code *section 188* because he acted under an unreasonable mistake of fact—that is, the need to defend himself against imminent peril of death or great bodily harm. We do not suggest that an unreasonable mistake of fact would be a defense under Penal Code *section 26.* Nor do we suggest that malice would be negated by a mistake of law, for example, if a defendant killed with the mistaken belief that he could properly use deadly force to protect his parked automobile against a vandal.

actual] but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury. (*People* v. *Flannel*[, *supra*,] 25 Cal.3d 668, 674-680 [citation].) This doctrine has no application to the facts before us, *and we do not decide whether it has been affected by Proposition 8 and the 1981 legislation.*" (*Saille, supra,* 54 Cal.3d at p. 1107, fn. 1, italics added; see also *People* v. *De Leon, supra,* 10 Cal.App.4th at p. 822 [noting our disclaimer in *Saille, supra,* 54 Cal.3d at p. 1107, fn. 1, that we were not deciding the continued validity of imperfect self-defense].)

Perhaps most important, even though we are not persuaded by respondent's view of Penal Code section 188, we acknowledge the inherent ambiguity in the statute's definition of express malice. " 'When language which is reasonably susceptible of two constructions is used in a penal law ordinarily that construction which is more favorable to the offender will be adopted.' " (*People* v. *Stuart* (1956) 47 Cal.2d 167, 175 [302 P.2d 5, 55 A.L.R.2d 705], quoting *People* v. *Ralph* (1944) 24 Cal.2d 575, 581 [150 P.2d 401]; *In re Tartar* (1959) 52 Cal.2d 250, 256 [339 P.2d 553].) Because the language of section 188's definition of express malice is, at the very least, reasonably susceptible to the construction asserted by defendant, we adopt that construction.[4]

---

[4]Although the focus of the parties in this court has been the meaning of Penal Code section 188's definition of express malice, the record is not clear whether the trial court's conclusion of second degree murder was based on a finding of express malice rather than implied malice. (The prosecutor referred to implied malice in closing argument.) Or, stated more simply, we cannot determine with certainty if the trial court found that defendant intended to kill rather than to wound Elliott.

This ambiguity, however, does not affect the applicability of the imperfect self-defense doctrine, because a defendant's actual belief in the need for self-defense against imminent peril would negate a finding of implied as well as express malice. As already noted, under section 188 malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." As Justice Traynor explained in his concurring opinion in *People* v. *Thomas* (1953) 41 Cal.2d 470, 480 [261 P.2d 1], implied malice is shown when "the defendant *for a base, antisocial motive* and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." (Italics added.) A defendant who acts with the requisite actual belief in the necessity for self-defense does not act with the base motive required for implied malice, i.e., with "an abandoned and malignant heart." (Accord, *People* v. *Wells, supra,* 33 Cal.2d 330, 345 [imperfect self-defense negates "malice aforethought" element of Penal Code section 4500 (assault by a life prisoner "with malice aforethought," a capital offense)].) A contrary conclusion, namely, that imperfect self-defense applies only in cases of express, but not implied, malice would lead to a totally anomalous and absurd result, in which a defendant, who unreasonably believes that his life is in imminent danger, would be guilty only *of manslaughter* if he acts *with the intent to kill* his perceived assailant, but would be guilty *of murder* if he does *not* intend to kill, but only to seriously injure, the assailant. There is no authority to support such an incongruous rule.

B. *The legislative history*

Because there is ambiguity, we may properly also look to the legislative history of the 1981 amendments. (*Brown* v. *Poway Unified School Dist.* (1993) 4 Cal.4th 820, 830 [15 Cal.Rptr.2d 679, 843 P.2d 624].) That history, though not unequivocal, leads to the same conclusion. We have not found a single reference to eliminating imperfect self-defense or even a clue that doing so was considered by the Legislature. Time after time, those involved in the legislative process made clear the purpose was to eliminate the diminished-capacity defense.

For example, an extensive analysis of the amendments by the Legislature's Joint Committee for the Revision of the Penal Code was titled: The Diminished Capacity Defense: Why Senate Bill 54?, and the committee explained, "The recent cases of Dan White in San Francisco and Richard Chase in Sacramento, brought to the public's attention an area of long standing controversy, the defenses of diminished capacity and insanity in criminal prosecution. . . . [¶] It [Senate Bill No. 54] would repeal the defenses of voluntary intoxication and diminished capacity." (Joint Com. for Revision of the Pen. Code Rep. (Sept. 3, 1981) p. 1 (1981-1982 Reg. Sess.).)

The same joint committee explained to the Governor's office that "[t]he defenses of *diminished capacity, diminished responsibility, and irresistible impulse* are repealed. . . ." (Letter from Joint Com. for the Revision of the Pen. Code to Governor's Deputy Legal Affairs Sect., Sept. 4, 1981, italics added.) There was no suggestion of eliminating imperfect self-defense. To the contrary, the same analysis stated that "to reduce murder to manslaughter, *except in the delusional self-defense kinds of cases*, there will have to be a showing of provocation, the traditional basis of manslaughter, to reduce murder to manslaughter." (*Ibid.*, italics added.)

The Governor's staff held the same view, explaining that Senate Bill No. 54 "makes a number of substantive and procedural changes relative to the general issue of diminished capacity defenses . . . [and is] an attempt to change the focus from the defendant's general *capacity to form* a given mental state to the ultimate question of whether the defendant in fact *actually had* the required mental state." (Analysis of Sen. Bill No. 54 by Governor's Legal Affairs Sect., pp. 1-2, italics in original.) As explained above, the doctrine of imperfect self-defense is based on the defendant's actual intent, not his capacity to form a particular intent.

Many other references to diminished capacity could be noted but would be unnecessary because the point is clear. The extensive analyses of the legislation by both its supporters and its opponents are replete with discussions of

the need and desire to abolish diminished capacity. But there is no discussion, not a single mention, of also eliminating imperfect self-defense.

### 3. *Public policy*

The question before us is, of course, one of statutory construction and we do not decide whether the Legislature in 1981 should have eliminated imperfect self-defense or whether it should do so now. That is a public policy issue properly left to the Legislature. As we recently observed in construing another group of statutes, "Our holding is based on the Act as it is written, not on a different, perhaps broader, version that could have been, or still may be, enacted." (*Waste Management of the Desert* v. *Palm Springs Recycling Center, Inc., ante,* 478 at p. 490 [28 Cal.Rptr.2d 461, 869 P.2d 440].) Public policy, however, is a relevant, albeit secondary, consideration for our decision in the present case. We are asked in this case to decide whether the Legislature intended to abolish a well-established legal doctrine that raises significant public policy considerations. We are not persuaded the Legislature would have silently, or at best obscurely, decided so important and controversial a public policy matter and created a significant departure from the existing law.

Indeed, a pending bill, Senate Bill No. 1144, generally relating to imperfect self-defense, has sparked extensive public comment and news coverage. Similarly, this case has attracted amici curiae whom one would not expect to join forces, ranging from defendants' rights groups to law-and-order and women's rights supporters. (Amici curiae for defendant are Orange County Women Lawyers Association, Criminal Justice Legal Foundation, California Public Defenders' Association, Public Defender of Orange County, Office of Public Defender of the City and County of San Francisco, and California Attorneys for Criminal Justice.) These groups raise significant issues regarding imperfect self-defense, including women's safety, the right of otherwise law-abiding citizens to defend themselves, and the need for legal distinctions based on moral culpability.

We find no indication the Legislature considered any of the policy issues attendant to elimination of imperfect self-defense. Of course, reasonable minds might differ on how these issues should be resolved. And, we do not suggest that the Legislature is required to give plenary, or any particular level of consideration, to an issue. The depth of the debate is the domain of the Legislature. But the absence of any debate or clear resolution of this matter further suggests the Legislature did not intend any change in the law or even consider the question. Unlike the dissent, we reject the view that the Legislature silently enacts major social policy. That view renders legislative intent—traditionally the touchstone of statutory construction—a nullity.

### 4. *Conclusion*

We hold the Legislature has not, whether in the 1981 amendments to the Penal Code or otherwise, eliminated the doctrine of imperfect self-defense. When the trier of fact finds that a defendant killed another person because the defendant actually but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and cannot be convicted of murder.

Respondent and others have suggested this defense will lead to a proliferation of unfounded claims of self-defense. We leave that concern to the Legislature. We caution, however, that the doctrine is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. We also emphasize what should be obvious. Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*' . . . [¶] This definition of imminence reflects the great value our society places on human life." (*People* v. *Aris* (1989) 215 Cal.App.3d 1178, 1187, 1189 [264 Cal.Rptr. 167], italics added.) Put simply, the trier of fact must find an *actual* fear of an *imminent* harm. Without this finding, imperfect self-defense is no defense.

We also emphasize that whether the defendant actually held the required belief is to be determined by the trier of fact based on all the relevant facts. It is not required to accept the defendant's bare assertion of such a fear. And, of course, a defendant's evidence of self-defense is subject to all the normal evidentiary rules, including Evidence Code sections 350 and 352. Finally, we reiterate that, just as with perfect self-defense or any defense, "[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense.*" (*People* v. *Aris, supra,* 215 Cal.App.3d at p. 1192, italics added.)

### DISPOSITION

Despite our extensive scrutiny of the record, we are unable to determine with certainty the precise basis of the trial court's determination that defendant was not entitled to the benefit of the imperfect self-defense doctrine. More specifically, the record is debatable whether the trial court found that defendant had an actual belief in the need for self-defense. The Court of Appeal read the record as reflecting that the trial court did accept defendant's assertion of an actual fear but that the trial court acted on a "basic

misunderstanding of the concept [of imperfect self-defense], as indicated by the statement that an honest but unreasonable belief in the need to defend carries with it the unlawful intent to kill." That is a fair reading of the record, but it also indicates that the trial court found that defendant lacked even an actual belief. Of course, this determination is dispositive. If defendant lacked even an actual belief, he is not entitled to the imperfect self-defense doctrine. If, however, he had an actual but unreasonable belief, he is entitled to the doctrine as set forth in this opinion.

We therefore reverse the judgment of the Court of Appeal and remand to that court with directions to remand this proceeding to the trial court: (1) To enter in the record, based on the proceedings previously held in that court, a specific finding of whether defendant held an actual belief of imminent harm; and (2) to thereupon conduct such further proceedings as may be warranted by our decision.

In light of our decision, we need not reach defendant's additional claims on appeal. If there is an appeal from the proceedings after our remand, defendant can reassert those claims at that time.

Mosk, J., Kennard, J., Arabian, J., and George, J., concurred.

**MOSK, J.,** Concurring.—Except for their discussion of implied malice, an issue not before us, I concur fully with the majority. But the presence of the dissent is yet another signal to the Legislature that the law of homicide is in need of revision.

My own recent separate opinions should have alerted the lawmakers to unnecessary complications in California homicide law. The cryptic law of implied-malice murder and the undue abstractness and open-endedness of the jury instructions on the subject are problems. (*People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 112 [13 Cal.Rptr.2d 864, 840 P.2d 969] (conc. opn. of Mosk, J.).) Another set of difficulties lies in the multiple anomalies that *People* v. *Whitfield* (1994) 7 Cal.4th 437 [27 Cal.Rptr.2d 858, 868 P.2d 272] has created for the law of unlawful homicide and intoxication: (1) a grossly intoxicated defendant may be punished less than a legally intoxicated, but not stuporous, defendant; (2) the parties will use the same evidence of intoxication to both prove and disprove culpability and the defendant will try to prove a greater degree of intoxication while the prosecution will try to prove a lesser degree, thereby doubly confusing the jury; and (3) if intoxication is successfully invoked as a defense to implied-malice murder, a drunk driver could receive a significantly higher penalty (Pen. Code, § 191.5) than someone who commits another reckless act and is convicted of only involuntary manslaughter (*id.*, §§ 192, subd. (b), 193, subd. (b)).

Equally important is "the need for legislative attention to the second degree felony-murder rule" (*People* v. *Patterson* (1989) 49 Cal.3d 615, 641 [262 Cal.Rptr. 195, 778 P.2d 549] (conc. & dis. opn. of Panelli, J.), a "court-created" doctrine (*People* v. *Clark* (1990) 50 Cal.3d 583, 656 [268 Cal.Rptr. 399, 789 P.2d 127] (conc. & dis. opn. of Kaufman, J.)) that "we have characterized . . . as 'anachronistic' (*People* v. *Burroughs* [(1984)] 35 Cal.3d [824] at p. 829) and 'disfavored' (*People* v. *Henderson* [(1977)] 19 Cal.3d [86] at p. 92), based on the view of many legal scholars that the doctrine incorporates an artificial concept of strict criminal liability that 'erodes the relationship between criminal liability and moral culpability.' (*People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130]; *People* v. *Satchell* (1971) 6 Cal.3d 28, 33 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383].) The Legislature . . . has taken no action to alter this judicially created rule, and has declined our more recent suggestion in *People* v. *Dillon* (1983) 34 Cal.3d 441, 472, footnote 19 [194 Cal.Rptr. 390, 668 P.2d 697], that it reconsider the rules on first and second degree felony murder and misdemeanor manslaughter." (*People* v. *Patterson*, *supra*, 49 Cal.3d at p. 621 (lead opn. of Kennard, J.).)

In the case of *People* v. *Whitfield*, *supra*, 7 Cal.4th 437, the statute is clear and the error lies in the majority's interpretation. (*Id.* at pp. 460-461 (conc. & dis. opn. of Mosk, J.); accord, *id.* at p. 477 (conc. & dis. opn. of Baxter, J.).) In the case of *People* v. *Nieto Benitez*, *supra*, 4 Cal.4th 91, the problem appears to be with the statute. This court's difficulty in deciding whether imperfect self-defense survived legislative changes also can be laid to statutory ambiguities. A considered legislative reexamination of the mental states and acts associated with various types of lawful and unlawful homicide is needed.

I take the liberty to also suggest this is a particularly appropriate time for the Legislature to carefully reconsider Penal Code section 1096, which prescribes for all criminal trials a definition of "reasonable doubt" in such archaic terms as "abiding conviction," "moral certainty," and "moral evidence." As I explained at length in my concurring opinion in *People* v. *Brigham* (1979) 25 Cal.3d 283, 292-316 [157 Cal.Rptr. 905, 599 P.2d 100], this anachronistic definition confuses, rather than clarifies, the critically important concept of reasonable doubt.

Although the United States Supreme Court did not reverse the judgments of conviction when similar instructions were given in *Victor* v. *Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239], it is plain the justices have many of the same serious reservations about the instruction on reasonable doubt that I have expressed. Although Justice O'Connor observed for

the majority that the jury likely did not consider the use of "moral certainty" in the instruction to suggest a standard of proof lower than due process requires, she forthrightly cautioned that "we do not condone the use of the phrase." (511 U.S. at p. ___ [127 L.Ed.2d at p. 597].)

Justice Kennedy, concurring, strongly condemned our reasonable doubt instruction. He wrote: "It was commendable for Chief Justice Shaw to pen an instruction that survived more than a century [*Commonwealth* v. *Webster* (1850) 59 Mass. (5 Cush.) 295, 320], but, as the Court makes clear, what once might have made sense to jurors has long since become archaic. In fact, some of the phrases here in question confuse far more than they clarify.

"Though the reference to 'moral certainty' is not much better, California's use of 'moral evidence' is the most troubling, and to me seems quite indefensible. The derivation of the phrase is explained in the Court's opinion, but even with this help the term is a puzzle. And for jurors who have not had the benefit of the court's research, the words will do nothing but baffle.

"I agree that use of 'moral evidence' in the California formulation is not fatal to the instruction here. I cannot understand, however, why such an unruly term should be used at all when jurors are asked to perform a task that can be of great difficulty even when instructions are altogether clear. The inclusion of words so malleable, because so obscure, might in other circumstances have put the whole instruction at risk." (511 U.S. at p. [127 L.Ed.2d at p. 601].)

Justice Ginsburg, also concurring, likewise agreed with the majority that "the term 'moral certainty' . . . should be avoided as an unhelpful way of explaining what reasonable doubt means." (511 U.S. at p. ___ [127 L.Ed.2d at p. 601].)

There is thus a strong possibility that legislative failure to substantially change Penal Code section 1096 may very well result in future reversals by the United States Supreme Court.

**LUCAS, C. J.**—I respectfully dissent.

Impressed, or possibly blinded, by what it perceives to be sound public policy, the majority resurrects a legal doctrine long ago abrogated by the Legislature. Ironically, the resurrection occurs in the midst of a fierce legislative/political debate on the very question whether or not to restore the doctrine, and if so, to what extent. (See, e.g., Jordan, '*Imperfect Self-Defense*' *is linked to Domestic Violence*, S.F. Daily J., (Feb. 16, 1994) p. 1; Martin, *Reasonable Women* (Mar. 1994) Cal. Law., p. 58 et seq.)

In a nutshell, when the Legislature redefined the legal concept of "malice" in 1981 by amendment to Penal Code section 188, it completely uprooted the doctrinal framework for the "imperfect self-defense" doctrine and left nothing in its place to support it. (Accord, Comment, *Dead or Alive: Did the California Legislature Abolish "Imperfect Self-Defense"?* (1993) 3 S.F. L.Rev. 1 [hereafter Comment].) If, as confirmed by this court in *People v. Flannel* (1979) 25 Cal.3d 668, 674-680 [160 Cal.Rptr. 84, 603 P.2d 1] (hereafter *Flannel*), the sole *statutory* underpinning for the doctrine was a broad, now abrogated, definition of malice as including an awareness of one's proper legal obligations to society, then there remains no statutory basis for the doctrine. No court, not even a supreme one, may create new defenses or revive abrogated ones simply as a matter of policy or preference. (See *Walker v. Superior Court* (1988) 47 Cal.3d 112, 135 [253 Cal.Rptr. 1, 763 P.2d 852] [common law defenses unavailable in California]; *Keeler v. Superior Court* (1970) 2 Cal.3d 619, 632 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420] [same].) Nor may a court create a new, nonstatutory offense (see Pen. Code, § 6), yet the majority's revival of imperfect self-defense does just that, creating a type of "imperfect" voluntary manslaughter not requiring heat of passion or provocation, and thus not provided by statute (see Pen. Code, § 192).

The precise issue before us is whether the Legislature, by provisions enacted in 1981 that abolished the defense of diminished capacity and redefined the element of malice aforethought required for a murder conviction, likewise abrogated the so-called doctrine of "imperfect self-defense." When applicable, this doctrine will reduce a murder charge to voluntary manslaughter if the defendant killed under an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury. (See *Flannel, supra,* 25 Cal.3d at pp. 674-680.) Unlike the majority herein, I conclude the imperfect self-defense doctrine has been legislatively abrogated by reason of the statutory redefinition of the element of malice aforethought.

I first review the development of the imperfect self-defense doctrine, and then summarize the 1981 statutory provisions (and 1982 initiative measure) which abrogated the doctrine. My analysis then turns to *People v. Saille* (1991) 54 Cal.3d 1103 [2 Cal.Rptr.2d 364, 820 P.2d 588] (hereafter *Saille*), wherein we considered a similar issue in the context of the partial defense of voluntary intoxication or mental disorder.

### 1. *The imperfect self-defense doctrine*

The development of the imperfect self-defense doctrine was fully traced in *Flannel, supra,* 25 Cal.3d 668. In that case, the defendant had been convicted

of second degree murder after shooting to death a man with whom he had previously argued and fought. The evidence indicated that the defendant believed his victim had a knife and was prepared to attack him with it.

Defendant relied on a self-defense theory. The court instructed on that theory, as well as on the subjects of first and second degree murder, malice, manslaughter, and intoxication as it bore on intent to commit murder. The court failed to instruct sua sponte on imperfect self-defense.

On appeal, we explained that an honest but unreasonable belief that it is necessary to defend oneself from immediate peril to life or great bodily injury (i.e., imperfect self-defense) will negate malice aforethought and reduce the offense from murder to manslaughter. (See *Flannel, supra,* 25 Cal.3d at pp. 674-680.) We held, however, that the trial court did not err in failing to instruct sua sponte on imperfect self-defense because, when the case was tried, the doctrine could not be considered a "general principle" of law requiring such instruction. (*Id.* at pp. 680-683.) For future cases, we indicated that sua sponte instructions on the doctrine would be required where appropriate. (*Id.* at p. 683.)

In the course of our discussion, we traced the development of the imperfect self-defense doctrine as follows: In *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53], the defendant had been charged with the capital offense of assault on a police officer. We noted that an "honest though unreasonable" fear of bodily harm would not constitute a complete defense to the assault but would negate the element of malice required for that offense. (*Id.* at p. 345.) A subsequent decision (*People* v. *Lewis* (1960) 186 Cal.App.2d 585, 598 [9 Cal.Rptr. 263]) applied the foregoing theory in a homicide context. Dictum in *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715, 718 [112 Cal.Rptr. 1, 518 P.2d 913], confirmed that instructions on "the effect of an unreasonable belief that deadly force was necessary in defense of self" would be appropriate in a murder case when the evidence shows the defendant believed he was acting in self-defense. (See *Flannel, supra,* 25 Cal.3d at pp. 674-677.)

The People had argued in *Flannel* that malice could be negated only by sudden quarrel or heat of passion on reasonable provocation (Pen. Code, § 192; further statutory references are to this code unless otherwise indicated) or by diminished capacity caused by voluntary intoxication, mental disease or mental defect (e.g., *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911] [hereafter *Conley*]). According to the People, "the doctrine of unreasonable belief is necessarily bound up with or limited by the concepts of either heat of passion or diminished capacity." (*Flannel,*

*supra,* 25 Cal.3d at p. 677.) We disagreed, noting that "[t]o hold that an honest but unreasonable belief in the need to defend mitigates to manslaughter only if accompanied by the heat of passion-type terror expected of a reasonable man renders superfluous the unreasonable belief doctrine expressed" in prior cases. (*Id.* at p. 678.)

*Flannel* explained that "[t]he nature of malice is central here for '[m]urder is the unlawful killing of a human being . . . with malice aforethought' (Pen. Code, § 187; '[m]anslaughter is the unlawful killing . . . , without malice.' (Pen. Code, § 192.)" (*Flannel, supra,* 25 Cal.3d at p. 679.) Relying on *Conley, supra,* 64 Cal.2d at page 322, we noted that if one is aware of his societal duty to act within the law, and nonetheless does an act likely to cause serious injury or death to another, he thereby exhibits a wanton disregard for human life or antisocial motivation that is equivalent to malice aforethought. (*Flannel, supra,* at p. 679.)

*Flannel* concluded its analysis by rejecting the People's claim that an honest belief, though unreasonably held, can be consistent with malice. As we stated, "[n]o matter how the mistaken assessment is made, an individual cannot genuinely perceive the need to repel imminent peril or bodily injury and simultaneously be aware that society expects conformity to a different standard. Where the awareness of society's disapproval begins, an honest belief ends. It is the honest belief of imminent peril that negates malice in a case of complete self-defense; the reasonableness of the belief simply goes to the justification for the killing." (*Flannel, supra,* 25 Cal.3d at p. 679.)

In sum, although *Flannel* rejected the People's contention that imperfect self-defense is "bound up or limited by" the diminished capacity doctrine, we stressed that imperfect self-defense operates to negate malice because it represents an unawareness of one's legal and societal obligations, a state of mind necessarily inconsistent with malice. In the present case, we must decide whether, by reason of post-*Flannel* statutory amendments redefining the concept of malice, the doctrine of imperfect self-defense has been abrogated.

### 2. *Statutory amendments*

As we noted in *Saille, supra,* 54 Cal.3d at page 1111, in September 1981, the Legislature "added to the Penal Code sections 28 and 29, which abolished diminished capacity and limited psychiatric testimony. It amended section 22 on the admissibility of evidence of voluntary intoxication, section

188 on the definition of malice aforethought, and section 189 on the definition of premeditation and deliberation. Other sections not relevant here were also amended."

Thus, Penal Code section 28, subdivision (a), provides in pertinent part that evidence of mental illness "shall not be admitted to show or negate the capacity to form any mental state," but is "admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." Subdivision (b) of section 28 abolishes the defenses of diminished capacity, diminished responsibility, and irresistible impulse "as a matter of public policy."

Penal Code section 29 provides that any expert testifying in the guilt phase of a criminal action "shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

Penal Code section 22 was amended to reflect the abolition of diminished capacity. It provides that evidence of voluntary intoxication is not admissible to negate the capacity to form any mental state, but it is admissible "solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

In addition, the Legislature amended Penal Code section 188 to define further the element of malice required for the crime of murder. This provision, which I maintain is dispositive of the issue before us, reads as follows: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [¶] *When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice.*" (Italics added to indicate 1981 addition.)

We also noted in *Saille* that "[a] provision abolishing the defense of diminished capacity was also included in the initiative measure adopted in

June 1982 and known as Proposition 8. Section 25 was added to the Penal Code as part of Proposition 8. Subdivision (a) of section 25 provides: 'The defense of diminished capacity is hereby abolished. In a criminal action, as well as any juvenile court proceeding, evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged.' " (54 Cal.3d at p. 1112.) Neither party herein has argued that the foregoing provision is relevant to the issue of the survival of the imperfect self-defense doctrine.

### 3. *People v. Saille*

Having set forth the pertinent provisions of the 1981 statutory amendments, I next review our analysis of those provisions in *Saille*, where a similar issue was raised regarding the survival of the partial defense of voluntary intoxication or mental disorder. There, we held that the foregoing statutory provisions combined to bar the "reduction of what would otherwise be murder to nonstatutory voluntary manslaughter due to voluntary intoxication and/or mental disorder." (54 Cal.3d at p. 1107, fn. omitted.) We found it unnecessary in *Saille*, however, to address the effect of these amendments upon the "so-called 'imperfect self-defense' doctrine [which reduces] an intentional killing from murder to manslaughter when a person kills under an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury." (*Id.* at p. 1107, fn. 1.)

In *Saille*, the defendant, after drinking several beers, killed a man during a struggle. On appeal from a murder conviction, he argued, inter alia, that the trial court erred in failing to instruct the jury that voluntary intoxication could negate express malice and reduce murder to voluntary manslaughter. Although we left open the question now before us, our analysis in *Saille* of the effect of the 1981 amendments on the preexisting doctrine of "nonstatutory voluntary manslaughter" is largely dispositive of the present issue.

*Saille* involved the continued vitality of the judicially created doctrine allowing a reduction of murder charges to voluntary manslaughter by reason of the defendant's lack of malice resulting from either voluntary intoxication or mental disorder. (See, e.g., *Conley, supra,* 64 Cal.2d at pp. 318-322 [one unable, because of intoxication or mental disorder, to comprehend his legal obligations to society cannot act with malice aforethought].)

As we noted in *Saille,* 54 Cal.3d at page 1110, our *Conley* decision, in explaining how diminished capacity negated malice, "redefined and expanded the mental component of malice aforethought beyond that stated in

[former] section 188 to include a requirement that the defendant was able to comprehend the duty society places on all persons to act within the law, i.e., that he had an 'awareness of the obligation to act within the general body of laws regulating society.' [Citation.] Pursuant to this definition, we concluded [in *Conley*] that someone who is unable, because of intoxication or mental illness, to comprehend his duty to govern his actions in accord with the duty imposed by law, cannot act with malice aforethought." (Fn. omitted.)

*Saille* then reviewed the 1981 statutory provisions, and particularly the amendment to Penal Code section 188 that added the following language: "When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice." (*Saille, supra,* 54 Cal.3d at p. 1113, italics omitted.)

*Saille* observed that "The first sentence of the [foregoing] passage limits malice to the definition set forth in section 188. This sentence clearly provides that once the trier of fact finds a deliberate intention unlawfully to kill, no other mental state need be shown to establish malice aforethought. Whether a defendant acted with a wanton disregard for human life or with some antisocial motivation is no longer relevant to the issue of express malice. [Citation.] No doubt about this conclusion is possible when the last sentence of section 188 is analyzed. That sentence directly repudiates the expanded definition of malice aforethought in *Conley, supra,* 64 Cal.2d 310 . . . , that express and implied malice include an awareness of the obligation to act within the general body of laws regulating society and the capability of acting in accordance with such awareness. After this amendment of section 188, express malice and an intent unlawfully to kill are one and the same. [Citation.]" (*Saille, supra,* 54 Cal.3d at pp. 1113-1114, fn. omitted.) *Saille* concluded that "Pursuant to the language of section 188, *when an intentional killing is shown, malice aforethought is established.* Accordingly, the concept of 'diminished capacity voluntary manslaughter' . . . is no longer valid as a defense." (54 Cal.3d at p. 1114, italics added.)

### 4. *Survival of imperfect self-defense*

As previously explained, the doctrine of imperfect self-defense, like diminished capacity/voluntary manslaughter, was derived from an expansive definition of malice that included an awareness of one's legal and societal obligations. (See *Flannel, supra,* 25 Cal.3d at p. 679; *Conley, supra,* 64

Cal.2d at p. 322.) Yet, as *Saille* observes, that broadened definition of malice has now been abrogated, and no mental state need be shown to establish malice other than "an intent unlawfully to kill." (Pen. Code, § 188.) Under *Saille,* it would appear to follow that imperfect self-defense is no longer available to negate the element of malice arising from an unlawful intentional killing, and thereby to reduce a murder to voluntary manslaughter.

The majority stresses that the legislative history that accompanied the 1981 amendments indicates no express intent to abrogate imperfect self-defense. First, I am not convinced of the validity of that premise, for the materials provided to the Legislature at the time it was considering these amendments included an analysis by the Assembly Committee on Criminal Justice stating as follows: "The purpose of this bill [including the 1981 amendments] is to eliminate the use of diminished capacity defenses; to eliminate psychiatric opinions on the ultimate issue of intent; *and to reverse Supreme Court decisions that require certain cognitive requirements for first and second degree murder.*" (Assem. Com. on Criminal Justice, Analysis of Sen. Bill No. 54, June 30, 1981, at p. 3, italics added.) The underscored language indicates a broader reach than merely abrogating the diminished capacity defense and could include reliance on *Flannel*'s imperfect self-defense doctrine to rebut malice.

But whether or not the Legislature intended to abrogate *Flannel,* the fact remains that it did amend Penal Code section 188 to exclude the *only* statutory support for the imperfect self-defense doctrine. I find no authority for the majority's apparent assumption that a statutory amendment can have no unanticipated consequences.

The majority nonetheless argues that one who kills with an honest though unreasonable fear of imminent peril cannot be said to intend to *unlawfully* kill his victim, as required by Penal Code section 188 to show express malice. Although the Legislature redefined "malice" to make it clear that unawareness of one's societal/legal obligations cannot negate malice, it left in place the definition of express malice as manifested by "a deliberate intention unlawfully to take away the life of a fellow creature." (Pen. Code, § 188.) The majority argues that mere intent to kill is insufficient unless the actor intended to act "unlawfully." Thus, if the actor honestly believed he could lawfully kill his victim, no matter how absurd that belief was, he would not be acting with express *or implied* malice. (Maj. opn., *ante,* at p. 779, fn. 3.).

There are several flaws in this analysis. First, the single word "unlawfully" is a very weak statutory hook on which to hang the entire doctrine of

imperfect self-defense. Certainly, neither *Flannel* nor any other case has relied on that word as significant in this regard. And I find it quite difficult to fathom how a doctrine entirely hidden within the statutory definition of express malice could possibly control the outcome in *implied* malice cases.

The majority suggests that one who acts with an unreasonable yet actual belief in the necessity of lethal resistance cannot demonstrate the "abandoned and malignant heart" required for implied malice murder. But no case has ever interpreted that language as incorporating the imperfect self-defense doctrine as a defense to implied malice murder. In any event, the implied malice issue was neither briefed nor argued and we should not reach it here.

Second, a similar argument was made in *Saille* in the context of a voluntary intoxication defense: Intoxication, it was argued, might reduce the ability to intend an "unlawful" killing. Rejecting the contention, we quoted with approval an earlier decision's observation that the word "unlawfully" merely referred to the lack of any *legally recognized* justification, excuse or mitigation for the killing. (See *Saille, supra,* 54 Cal.3d at pp. 1114-1115; see also *People* v. *Bobo* (1990) 229 Cal.App.3d 1417, 1433-1434 [3 Cal.Rptr.2d 747]; *People* v. *Stress* (1988) 205 Cal.App.3d 1259, 1268 [252 Cal.Rptr. 913].)

Third, under the majority's construction of the word "unlawfully," a defendant could avoid a murder conviction because of his *unreasonable* mistake of fact as to the necessity of using lethal force to defend himself. But our cases make clear that in order for a mistake of fact to constitute a defense, it must be an honest *and reasonable* one. (E.g., *People* v. *Williams* (1992) 4 Cal.4th 354, 360-361 [14 Cal.Rptr.2d 441, 841 P.2d 961]; *People* v. *Mayberry* (1975) 15 Cal.3d 143, 155 [125 Cal.Rptr. 745, 542 P.2d 1337]; *People* v. *Hernandez* (1964) 61 Cal.2d 529, 534-536 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092]; *People* v. *Vogel* (1956) 46 Cal.2d 798, 801 [299 P.2d 850].)

Fourth, and most critical, to accept the majority's construction of the word "unlawfully" as including a threshold subjective awareness of the illegality or wrongfulness of one's conduct would conflict with the express language of amended Penal Code section 188 that an awareness of one's legal or societal obligations is no longer a prerequisite to a finding of malice. Stated another way, if one who is wholly unaware of his obligation to obey the law is nonetheless deemed capable of acting with malice (as now provided in § 188), then it would follow that one who mistakenly assesses the nature of his peril and the legality of a lethal response likewise must be deemed so

capable. To hold otherwise would improperly create a theory of defense unauthorized by the Legislature.

The majority mentions the views of amicus curiae Orange County Women Lawyers Association that preservation of the imperfect self-defense doctrine is appropriate to assist battered or abused women charged with murdering their husbands or other persons who have subjected them to extreme abuse. (See Evid. Code, § 1107 [admissibility of evidence of battered women syndrome].) But in light of the express language of Penal Code section 188 redefining the element of malice, arguments regarding the social utility of the defense seem more properly addressed to the Legislature. Indeed, in 1993, legislation was proposed (1) to add a provision to the Penal Code codifying the imperfect self-defense doctrine (Assem. Bill No. 947), and (2) to amend the self-defense laws to provide additional defenses, including imperfect self-defense, in "domestic violence" situations (see Sen. Bill No. 1144). Although neither bill had passed before the Legislature adjourned in September 1993, presumably these bills will be reintroduced.

## 5. *Conclusion*

When he wrote *Flannel* in 1979, Justice Tobriner undoubtedly realized that it was improper for this court to create a defense, partial or otherwise, having no statutory basis. Imperfect self-defense cannot derive from the self-defense statutes (Pen. Code, §§ 195-199), for they afford an absolute defense to homicide and require reasonable belief. For the same reason, the doctrine cannot arise from the mistake of fact provision (*id.*, § 26). Moreover, the doctrine cannot be based on the voluntary manslaughter statute (*id.*, § 192, subd. (a)), with its requirements of heat of passion and provocation. Thus, *Flannel* relied on the only remaining statutory basis to support the doctrine of imperfect self-defense, namely, the concept of malice (*id.*, § 188), as broadly interpreted by prior court decisions such as *Conley, supra,* 64 Cal.2d 310.

The 1981 amendments rewrote the law of malice. *Conley* was discredited and *Flannel*'s statutory justification for the doctrine vanished. Unless we wish to exercise unprecedented judicial power and create the doctrine afresh based on our personal views of suitable public policy, we must forthrightly acknowledge the problem and allow the Legislature to deal with it as it deems appropriate. (See generally, Comment, *supra,* 3 S.F. L.Rev. 1.)

I would reverse the judgment of the Court of Appeal with directions to resolve the minor's remaining appellate issues.

Puglia, J.,* concurred.

Respondent's petition for a rehearing was denied August 11, 1994.

---

*Presiding Justice, Court of Appeal, Third Appellate District, assigned by the Acting Chairperson of the Judicial Council.