Filed 2/21/14  P. v. Sanchez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B241343 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA094607) |
| v. | |
| CONSTANTINO V. SANCHEZ, | |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Los Angeles, Steven D. Blades, Judge.  Affirmed.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Mary Sanchez and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Constantino V. Sanchez appeals from his judgment of conviction for attempted murder with a firearm enhancement. His appeal contends that he was prejudiced by the trial court's refusal to present to the jury—or to permit his counsel to argue to the jury—his theories of self-defense or the lesser included offense of voluntary manslaughter, and that the evidence was insufficient to support the jury's determination that he had acted deliberately and with premeditation. We affirm the judgment.

### The Case

Appellant Sanchez was charged by information with one count of attempted willful, deliberate, and premeditated murder. (Pen. Code, §§ 187, subd. (a), 664.)[1] The information also charged special allegations that Sanchez intentionally used and discharged a handgun (§ 12022.53, subds. (b)-(d)), causing the offense to be a serious felony (§ 1192.7, subd. (c)(8)) and a violent felony (§ 667.6, subd. (c)(8)), and that in the commission of the offense Sanchez inflicted great bodily injury upon another who was not an accomplice (§ 12022.7, subd. (a)), also causing the offense to be a serious felony under section 1192.7, subdivision (c)(8). Sanchez pleaded not guilty and denied the special allegations.

The jury found Sanchez guilty of attempted willful, deliberate and premeditated murder, and the firearm special allegation under section 12022.53, subdivision (d). The court imposed a sentence of life imprisonment for the attempted murder, with an additional 25 years to life imprisonment for the firearm enhancement. Sanchez appeals from the judgment. (§ 1237, subd. (a).)

### The Facts

Sanchez worked in construction, as did Ricardo Cortez. As of June 2011, he had worked under Jose Ramirez, a more senior worker, for about a year. Cortez had also worked under Ramirez for some weeks or months, usually together with Sanchez.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

2

A few weeks before June 15, 2011, Sanchez asked Ramirez for Cortez's phone number so he could call Cortez about not being at the jobsite when a load of stucco arrived. Leticia, Cortez's fifteen-year-old daughter who was using her father's phone at the time, answered, telling the unidentified caller that her father was not then home. Sometime after that day Leticia received another call on her father's phone from the same caller. After she told the caller that her father was not there, the caller, who identified himself as "Catalino," kept talking to her, telling her that her voice sounded pretty, asking if the phone was hers, asking if she wanted to go out for coffee with him, and telling her that he would give her a phone as a gift if she wanted, so they could stay in contact.

Leticia told the caller that she did not accept gifts from others, and reported the conversation to her father.[2] Cortez later called the caller's phone number, and when Sanchez answered he told him, angrily, to stop calling and bothering his daughter. According to Cortez, Sanchez responded that he had no fear and that they would be meeting again. Cortez said that was fine because he wanted to talk to Sanchez about it in person, but he did not want any problems.

Cortez then told Ramirez that he did not want to work with Sanchez anymore, because Sanchez was calling his daughter. Ramirez spoke with their mutual boss, who told him to keep Cortez and Sanchez separated, but to tell them to work out their differences so he would not have to fire either of them. Cortez understood from Ramirez that he and Sanchez would not be working together.

When Cortez arrived at his jobsite on June 15, 2011, Sanchez was not there. When Sanchez arrived at the jobsite, Cortez asked if he would be working there that day, and told Sanchez to just "do your job and I'll do mine." But Sanchez then asked if Cortez was upset that he was calling Cortez's daughter. Cortez said he did not want any problems, and—loudly—that he could fix everything with a call to the police. He walked toward his truck, intending to copy Sanchez's car license and leave the jobsite. But Sanchez then got into his car, pulled forward blocking Cortez's truck, and pointed a

---

[2] The conversation was in Spanish.

handgun at Cortez through the passenger window. Cortez turned and ran. Cortez testified that he had in his pocket a screwdriver and a blade he used for his wall-texturizing work, but he did not show them to Sanchez at any time.

A surveillance video of the scene shows Cortez running, followed by Sanchez. Cortez tried to retrieve his cell phone from his pocket, but dropped it as he ran. When he stopped to pick it up, Sanchez kept coming forward. Cortez turned and stepped toward Sanchez, holding up his hand with his palm toward Sanchez and telling him not to shoot.

Sanchez fired a shot that missed Cortez. Sanchez's second shot, by then from about three feet away, hit Cortez in the right arm or shoulder and exited the other side. Cortez then fell upon Sanchez, trying to grab the gun with his left hand. Sanchez's third shot went through Cortez's left hand, grazing his head and hitting his left ear. Cortez then grabbed the gun's barrel with his right hand, and Sanchez fired another shot that hit the lower left side of Cortez's nose. Cortez threw Sanchez to the ground, pulled the gun from Sanchez's hand, and tried to fire it at Sanchez. When the gun did not fire, he straddled Sanchez and hit him in the face a number of times with the gun's handle.

Cortez then got up, leaving Sanchez and the gun on the ground and walking back toward his truck. (He explained that he left the gun behind both because he believed it was empty, and because he feared he might be shot if he had it when the police arrived.) He asked someone nearby to call the police for him. Ramirez received a call from Cortez at about 7:30 that morning, telling him to call the police and an ambulance.

Sanchez got up, went to his car, and drove away. Cortez was in the hospital for six days, and suffered pain and long-term effects from his injuries.

Jose Almonte witnessed the incident from his car across the street, from the time Cortez stopped to pick up something from the ground.[3] Almonte heard three shots and saw the men hitting each other, testifying that Cortez had no weapon. He saw Cortez hit Sanchez with the gun more than twice, but the hitting did not begin until after Cortez had been shot. When Cortez walked away from Sanchez, both men were bleeding "a lot."

---

[3] Almonte had stopped to locate his own phone. He identified Sanchez as "the shorter man" or "the smaller man," and Cortez as "the taller man" or "the bigger man."

4

Cortez went back to the building; Sanchez walked to his car and drove away. After the police arrived Cortez was taken to a hospital for his injuries.

At the scene the police found signs of a struggle. On the ground they found a firearm magazine containing one or two rounds, a lot of blood and scattered nails, a cell phone, a baseball cap, a notebook, a piece of paper with numbers and letters written on it, and three bullet casings. A police officer, off duty and driving home at the time, found a car stopped in the carpool lane of the freeway near the Diamond Bar exit, with the sole occupant—Sanchez—bleeding from his face. When the officer saw the handgun in Sanchez's waistband he called for assistance. Sanchez was removed from the car by paramedics. A holster and two handgun magazine clips with about 20 live rounds fell from the back of Sanchez's pants as they were removed.

Sanchez's version of the events differed in some respects from Cortez's. He testified that he had made only one call to Cortez's phone, that it had been in Ramirez's presence, and that he had just left a message with Leticia and hung up. He denied telling Leticia that she had a pretty voice, denied inviting her to join him for coffee, and denied offering to give her a phone. He said that he had been afraid of Cortez for some weeks before the June 15 incident—since Cortez had first accused him of bothering his daughter—because he had seen how angry Cortez could be.

Sanchez was surprised to see Cortez's truck when he arrived at the jobsite on June 15, 2011, because he had understood from Ramirez that Cortez had been suspended for two weeks. He saw Cortez coming out of the bathroom cleaning his knife and putting it in his pocket. He did not think the knife he had seen Cortez put in his pocket (which Cortez said he used for his work on the interior windows of the jobsite) could be considered a deadly weapon.

Cortez told him that "I don't want to fight with you anymore," to which he responded that he was happy to hear that. However, when he added that he also had three daughters, "and I was never opposed to others talking to them," Cortez suddenly threatened to kill him, "because you are worthless in regards to taking care of your

5

family." Sanchez said that he apologized to Cortez for causing any offense, he offered to go home, and he went to his car in order to leave.

As he was pulling away, however, he said that Cortez taunted him as a coward for leaving. Cortez walked toward him ("as if he was going to come and talk with me," Sanchez said). Sanchez accepted what he took as a challenge, grabbing his gun and holding it up.

At that point Cortez said for Sanchez to "follow me here a little bit," and they walked away, Cortez in front with Sanchez following. At the corner, Cortez began running. Sanchez ran too, so as not to lose sight of him, "[s]o if he were to grab something, a weapon, I had to defend myself." According to Sanchez, he believed that Cortez was going to get a weapon. Sanchez said that by following Cortez, he knew they would fight and "obviously we were going to kill each other." He brought the gun with him when he followed Cortez, because by then "the fight was already on."

Cortez stopped when he was almost 20 feet ahead of Sanchez, bent over, picked something up—which Sanchez did not see, but he thought might be a weapon—and turned around. Sanchez did not stop, but continued toward Cortez with his gun drawn as Cortez stepped toward him (as he confirmed while viewing the surveillance video).

He explained that although he didn't want to shoot Cortez, he pulled the trigger the first time "just trying to get him scared so that he could continue running because I was just going to leave him." He shot Cortez in the hand in order to scare him, "trying to make him stop." By shooting, "I was just getting him scared." He kept shooting "because he had already come at me, and I thought that he was carrying a weapon to defend himself." Sanchez said he thought Cortez was going to harm him. At that point, he admitted, Cortez had not yet touched him. "I wanted him to stop running, but it was the contrary. He then came even stronger towards me."

According to Sanchez, after intentionally shooting Cortez in the hand he fired the rest of the shots only to empty the gun, not to hit Cortez, "because he was gonna use it and he was already on top of me." But he also confirmed that Cortez had not yet caught him, and that he had fired all five shots before Cortez touched him.

6

The last thing Sanchez remembered that day was Cortez telling him that he (Sanchez) had already beaten the shit out of him (Cortez), and Sanchez's response that "Well, I already apologized, and you didn't want to accept my apology and you wanted things this way." Then he was struck by Cortez's blows to his head while he asked for mercy, and he remembers nothing more.

## Discussion

Sanchez's appeal raises four contentions: That the evidence was insufficient to support the jury's findings that his attempted murder of Cortez was deliberate and premeditated, under the sentence-enhancement provisions of section 664, subdivision (a); that because the evidence was sufficient to support a finding that he acted in self-defense, the trial court erred in failing to instruct the jury on that theory and in refusing to permit his counsel to argue that theory to the jury; and that because the evidence was sufficient to support the lesser-included offense of attempted voluntary manslaughter, based on the theories of both heat of passion and imperfect self-defense, the trial court erred in failing to instruct the jury on those theories and in refusing to permit his counsel to argue them to the jury. Sanchez contends that these errors violated California law and his rights to a fair trial under the Constitutions of both California and the United States, and that their cumulative effect rendered his trial fundamentally unfair and the verdict unreliable.

We conclude that the evidence was sufficient to support the findings of deliberation and premeditation, and that the trial court did not err in refusing to submit the defense of self-defense to the jury, or in refusing to instruct the jury on the lesser included offense of voluntary manslaughter based either on the theory of heat of passion or of imperfect self-defense. We therefore affirm the judgment.

## A. The Evidence Is Sufficient to Show Deliberation and Premeditation.

### 1. Standard of Review

A criminal conviction is supported by sufficient evidence for purposes of federal and state due process requirements if evidence in the record "could reasonably support a finding of guilt beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307,

7

318, fn. omitted; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (*Jackson v. Virginia*, *supra*, 443 U.S. at pp. 318-319, citation & fn. omitted; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 87 [reviewing court must determine whether record, when viewed in light most favorable to the judgment, contains evidence from which a rational jury could find defendant guilty beyond a reasonable doubt].)

A conviction that is not supported by evidence sufficient to establish each of the elements of the charged offense violates the due process guarantees of the California and federal Constitutions, and is invalid. (*People v. Rowland* (1992) 4 Cal.4th 238, 269.) However, reversal of the verdict rendered by a jury is warranted only if "upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

The mental state required for proof of attempted murder is different from that required for murder itself. Murder does not require proof of an intent to kill; "[i]mplied malice—a conscious disregard for life—suffices." (*People v. Bland* (2002) 28 Cal.4th 313, 327.) However, "'[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Perez* (2010) 50 Cal.4th 222, 229-230.) Nevertheless, "'"the act of firing toward a victim at a close, but not point blank, range 'in a manner that could have

inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .'"'"'" (*Id.* at p. 230.)

In this case the jury was correctly instructed that to prove Sanchez guilty of attempted murder, the evidence must show that he "took at least one direct but ineffective step toward killing another person," and that he intended to kill that person. (CALCRIM No. 600; § 187, subd. (a); *People v. Lee* (1987) 43 Cal.3d 666, 670.) Sanchez does not challenge these instructions, nor the sufficiency of the evidence to show that he is guilty of attempted murder. However, he does challenge the sufficiency of the evidence to establish that he acted with deliberation and premeditation.

## 2. Deliberation and premeditation

In addition to proving that Sanchez acted with the intent to kill Cortez, the prosecution in this case sought to prove that Sanchez's attempts to kill were willful, deliberate, and premeditated, justifying additional punishment. (§ 664, subd. (a).) A verdict of deliberate and premeditated murder (or attempted murder) requires proof of more than merely an intent to kill. "'Deliberation' refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation . . . does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]"'" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)

Consistent with this law, the jury was instructed that in order to find Sanchez guilty of attempted murder as charged in the Information, it must find that Sanchez acted not just with an intent to kill Cortez ("willfully"), but also "with deliberation and premeditation." Sanchez "deliberated," the jury was told, "if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." And he "premeditated" it was instructed, "if he decided to kill before acting." (CALCRIM No. 601; *People v. Perez* (1992) 2 Cal.4th 1117, 1123-1124.) Sanchez

9

contends on appeal that the evidence is insufficient to establish that he deliberated and premeditated before committing the attempted murder.

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), our Supreme Court addressed the evidence that shows deliberation and premeditation in carrying out an intention to kill.  (*Id.* at p. 25.)  The same evidence shows deliberation and premeditation in carrying out an *attempt* to kill.  (*People v. Brito* (1991) 232 Cal.App.3d 316, 323-324.)

"'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'"  (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)  However, "'"[t]he process of premeditation and deliberation does not require any extended period of time.  'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]"'"  (*People v. Houston* (2012) 54 Cal.4th 1186, 1216; *People v. Hughes* (2002) 27 Cal.4th 287, 370-371 [true test is extent of reflection].)

Evidence sustains a finding of premeditation and deliberation tends to fall into one of three categories:  (1) facts about a defendant's behavior that show prior planning of the killing; (2) facts about any prior relationship or conduct with the victim from which the jury could infer motive; and (3) facts about the manner of the killing from which the jury could infer that the defendant killed the victim according to a preconceived plan.  (*Anderson*, *supra*, 70 Cal.2d. at p. 26.)  A verdict will be upheld when there is extremely strong evidence of planning (category 1); or when the evidence shows a motive to kill (category 2) in conjunction either with evidence of planning (category 1), or with evidence of a manner of killing showing a preconceived design (category 3).  (*Id.* at pp. 26-27; *People v. Bloyd* (1987) 43 Cal.3d 333, 348.)  The list of categories is not exhaustive; it is merely an aid in "assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*People v. Perez*, *supra*, 2 Cal.4th at p. 1125.)

10

The record is undisputed that Sanchez went to the jobsite on June 15, 2011, the day of the shooting, armed with a loaded handgun, and it is sufficient to show also that he took with him two loaded magazine clips in the back of his pants. The evidence (some of it disputed) was that before Sanchez pointed his gun at Cortez, Cortez had told him to stop bothering his underage daughter; that Sanchez had indicated he would continue the calls to Cortez's daughter; that Cortez had disparaged Sanchez's abilities as a father, had threatened to report Sanchez's conduct to the police, and had copied or attempted to copy Sanchez's license plate number; and that Sanchez had then blocked Cortez's truck from leaving the jobsite.

The jury was not required to accept Sanchez's contrary explanations, that he had not expected to find Cortez at the jobsite that morning, that he had brought his loaded handgun to the jobsite only in order to leave it at his son's home after work that day, that he had not heard Cortez's threat to call the police, and that he had moved his car intending to leave the jobsite. The prosecution's burden of proof cannot be met by mere disbelief of the defendant's explanations (*People v. Velazquez* (2011) 201 Cal.App.4th 219, 231), but the cited evidence supports an inference that Sanchez had engaged in at least some advance planning for his violent confrontation with Cortez. (See *People v. Miranda* (1987) 44 Cal.3d 57, 87 [fact that defendant attempting robbery brought loaded gun into store suggests he considered possibility of murder in advance].)

Evidence of the events that followed strengthen the inference that Sanchez acted with deliberation and premeditation. When Sanchez blocked Cortez's truck and pointed his gun at Cortez, Cortez ran (or walked away, according to Sanchez), and Sanchez followed (at Cortez's request, according to Sanchez). Sanchez brought the gun with him, he claimed, because he believed Cortez had challenged him and was leading him to a place they would fight. Although earlier he had seen Cortez put a knife of some sort in his pocket, he did not believe it was sufficient to pose a deadly threat. This evidence shows that when Sanchez got out of his car and followed Cortez, he intended to fight with Cortez. He brought his gun with him after having considered that Cortez was bigger

11

than him, and that Cortez had a non-lethal knife in his pocket. That train of thought reflects planning, not heat of passion.

The inference that Sanchez considered in advance whether to shoot Cortez, rather than acting on impulse alone, is strengthened also by the fact that he took his first shot at Cortez after Cortez had stopped, bent over, picked up something, and "he was going to come at me . . . ." Sanchez said that because he thought Cortez might have picked up an unseen weapon "to defend himself," he stopped about 10 feet from Cortez and fired the first two shots, the second of which hit Cortez. But while watching the surveillance video with the jury, Sanchez confirmed that when Cortez stopped to pick something from the ground he was about 19½ feet away ("from here to the gate" in the courtroom), and that after Cortez had stopped running he continued moving toward Cortez, not away from him. He said that when he fired his gun he was not trying to kill Cortez; "I was just getting him scared," so Cortez would again turn and run, and Sanchez could simply leave. That conscious and intentional use of potentially deadly force to deter Cortez from approaching, when Cortez was still at some distance from him and had posed no immediate threat, is evidence of deliberation and premeditation.

Sanchez's decision to continue shooting also reflects deliberation and premeditation. He said that he did not necessarily intend either to hit or to miss Cortez when he fired his final three shots at a distance of just two or three feet from Cortez, but intended only to empty the gun so Cortez could not shoot him after taking it. But although this testimony denies any intention that his last three shots would hit Cortez, it also admits that he consciously thought about—planned—the purpose and consequences of his acts before he fired the gun.

The evidence presented to the jury therefore was sufficient to support its verdict that Sanchez was guilty of deliberation and premeditation in shooting Cortez, as charged in the information. It showed conduct within all three of the categories identified in *Anderson*, *supra*, from which the jury was entitled to infer that Sanchez had planned for his violent confrontation with Cortez, by bringing his gun to the jobsite, by blocking Cortez's truck when he intended to leave, by drawing and pointing his gun at Cortez from

12

his car, by chasing Cortez when Cortez ran from the jobsite, and by intentionally firing his gun toward Cortez, when Cortez was still as far as 19 feet away, and again when he was at very close range. It showed that Sanchez had a motive for his conduct toward Cortez, arising from Cortez's alleged history of accusing Sanchez of being a bad father, of threatening to kill Sanchez, and of threatening to call the police. And it showed evidence of planning by Sanchez when he followed or chased Cortez, bringing his gun to what he believed would be the scene of a violent confrontation with Cortez, and advance consideration of his purpose in firing the shots that wounded Cortez. (*Anderson*, *supra*, 70 Cal.2d at p. 26.) That evidence supports the jury's determination that he acted with premeditation and deliberation in attempting to kill Cortez.

**B.** **The trial court correctly found the evidence insufficient to justify jury consideration of the defense of self-defense.**

Sanchez contends that the trial court erred in refusing to instruct the jury on the defense of self-defense and in refusing to permit his counsel to argue that theory to the jury. He contends that denial of his request for self-defense instructions usurped the jury's role as fact finder, deprived him of his Sixth Amendment right to a jury trial, and was prejudicial to his rights under federal and state constitutional law. We find no error.

The trial court has a duty to instruct the jury on the principles of law governing all the issues—including all defenses—that are supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 157.) However, it must instruct on self-defense only when the evidence is sufficient to support a verdict of acquittal based on the defense, and the defendant is either relying on the defense or his theory of the evidence is not inconsistent with it. (*In re Christian S*. (1994) 7 Cal.4th 768, 783; *People v. Villanueva* (2008) 169 Cal.App.4th 41, 49.) In reviewing whether the evidence is sufficient to support the defense, the court "determines only its bare legal sufficiency, not its weight." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 177.)

Here, the evidence was not sufficient to support Sanchez's acquittal of attempted murder based on the doctrine of self-defense.

The doctrine of self-defense is narrow. To establish self-defense as a defense to the charge of attempted murder, there would have to be substantial evidence that Sanchez had an actual belief that shooting Cortez was necessary to defend himself from imminent danger of death or great bodily injury from Cortez; and there would have to be substantial evidence showing that his belief was objectively reasonable. (*In re Christian S.*, *supra*, 7 Cal.4th at p. 783.) The fear that induced him to shoot must be shown to have been a fear of "imminent danger to life or great bodily injury." Fear of future harm—"no matter how great the fear and no matter how great the likelihood of the harm—will not suffice." (*Ibid.*) "'"[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from appearances, must be instantly dealt with. . . ."'" (*Ibid.*; *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1269-1270.) And the circumstances must be sufficient not merely to have caused Sanchez to act out of fear, but they must be shown to be "sufficient to excite the fears of a reasonable person," and must have been the sole basis for his conduct. (§ 198.)

In support of his right to rely on the defense Sanchez cites evidence when he fired the shots, "he was defending himself against the imminent use of force by Mr. Cortez." But the evidence he cites for that proposition does not live up to its billing.

Sanchez testified that he had been in fear of Cortez for some weeks before the shooting, and had left a previous jobsite because of Cortez's threats. But when he found Cortez at the jobsite on the morning of June 15, 2011, he did not leave. He confirmed that Cortez said he wanted no fight but wanted only that Sanchez would stop calling his young daughter, and that he responded by telling Cortez that he had permitted his own daughters to talk to others and they had married older men. Sanchez said that he then apologized and intended to leave the jobsite, but stayed and followed Cortez for a fight after Cortez had challenged his manhood and "comes at me as if he was going to come and talk with me." Sanchez testified that he ran after Cortez "because I thought he was gonna go and get a weapon and that he had a weapon." But for all the evidence shows, when Cortez walked away, Sanchez could simply have driven away from the jobsite as he said he had intended to do.

14

Sanchez did not say that he fired at Cortez because he was in any immediate fear for his life. He testified that when Cortez had stopped running, picked up something—perhaps a weapon—and turned toward Sanchez, he was afraid. "I thought that he was going to assault me." But he had followed Cortez, with his gun, he said, because Cortez had challenged him to fight to the death and "obviously we were going to kill each other, the fight was already on."

He fired his first shot when Cortez stopped, intending just to scare Cortez, "not to hit him," because he feared that Cortez "was going to come at me." He was "just trying to get him scared so that he could continue running because I was just going to leave him," apparently abandoning the fight. But at that time Cortez was still about 20 feet away, and admittedly, Sanchez had continued running toward Cortez, not away from him.

He admittedly fired all five shots before Cortez reached him. He said that he shot because he was afraid that Cortez "was going to come at me." But that was a fear of a future event, which might happen only after he caught up with Cortez. And according to Sanchez's account, it came only after he had run after Cortez, intending to follow him to what he believed would be a fight to the death.

This testimony describes a fear of danger arising from Cortez's greater size, the possibility that he might have obtained a weapon of some sort, the relatively small gap of some 20 feet between them, and the fact that Sanchez had followed Cortez in order to engage in a potentially violent or deadly altercation. But it was fear of future harm, not of a threat that required an immediate violent response. If his fear at that point was genuine, it was not based on an immediate and existing threat to his life; it could have been based only on the threat of a danger that might become immediate in the future—for example, after he and Cortez had narrowed the 20-foot gap that separated them, as Sanchez admittedly continued to do. Even if Sanchez's description of the events and his emotions at the time were credited by the jury, there would be no basis on which to find that when Cortez stopped running, almost 20 feet away, and Sanchez began shooting, he did so because he actually and reasonably believed that he faced immediate danger of

15

death or great bodily injury. (*In re Christian S*., *supra*, 7 Cal.4th at p. 783; *People v. Rodriguez*, *supra*, 53 Cal.App.4th at pp. 1269-1270.)

Even if Sanchez actually and reasonably believed that Cortez would grab his gun away and use it against him (as in fact happened, after he had shot twice at Cortez from a distance, hitting him once, and had then shot him three more times at close range), that belief could not trigger Sanchez's right to rely on the defense of self-defense in order to obtain an acquittal on the charge of attempted murder. A "[h]omicide is also justifiable" when it is committed in the lawful defense of a person against one who "manifestly intends or endeavors, by violence or surprise, to commit a felony," or when there is reasonable ground to fear great bodily injury "and imminent danger of such design being accomplished"; but when the person asserting the defense "was the assailant or engaged in mutual combat," he or she must first actually and in good faith "have endeavored to decline any further struggle before the homicide [or in this case, the attempted homicide] was committed." (§ 197; *People v. McAuliffe* (1957) 154 Cal.App.2d 332, 340.) "[A] quarrel provoked by a defendant, or a danger which he has voluntarily brought upon himself by his own misconduct, is not sufficient to support a reasonable apprehension of imminent danger." (*People v. Holt* (1944) 25 Cal.2d 59, 65-66.) "[W]hen a defendant seeks or induces the quarrel which leads to the necessity for killing his adversary, the right to stand his ground is not immediately available to him, but, instead, he must first decline to carry on the affray and must honestly endeavor to escape from it." (*Id.* at p. 66; see also *People v. McAuliffe* (1957) 154 Cal.App.2d 332, 339.) "'A man has not . . . the right to provoke a quarrel and take advantage of it, and then justify the homicide. . . . "There is certainly no law to justify the proposition that a man may be the assailant and bring on an attack, and then claim exemption from the consequence of killing his adversary on the ground of self defense."'" (*People v. Holt*, *supra*, 25 Cal.2d at p. 66; *People v. Hill* (2005) 131 Cal.App.4th 1089, 1102.) In this case the threat to Sanchez was not imminent or even likely, by any account, until after he had followed Cortez in order to fight, until after he had continued to approach Cortez with gun drawn after Cortez had stopped and turned, and until after he had already shot twice at Cortez, hitting

16

him at least once. (See *People v. Valencia* (2008) 43 Cal.4th 268, 288 ["not every unreasonable belief will support a claim of imperfect self-defense but only one that, if reasonable, would support a claim of perfect self-defense"].)

Because there was no evidence from which a jury could reasonably conclude defendant held an actual and reasonable belief in the need to defend himself against imminent danger of lethal force, and because the only evidence was that Sanchez sought (if not induced) the quarrel, and did not withdraw from it despite many opportunities to do so, the trial court correctly denied his request that his counsel be permitted to argue the defense of self-defense to the jury, and that the jury be instructed on the defense. (*People v. Rodriguez, supra*, 53 Cal.App.4th at p. 1270; *People v. DeLeon* (1992) 10 Cal.App.4th 815, 824–825.)

## C. The record lacks evidence sufficient to justify jury consideration of the lesser included offense of attempted voluntary manslaughter, based on theories of either imperfect self-defense or heat of passion.

Attempted voluntary manslaughter is a lesser included offense of attempted murder. (*People v. Rios* (2000) 23 Cal.4th 450, 460; *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.) Two accepted grounds will support a determination that a defendant who is guilty of an intentional killing is guilty of the lessser included offense of voluntary manslaughter rather than murder (and the same grounds apply to an attempted killing). A killing (or attempted killing) resulting from a sudden quarrel or done in the heat of passion may be found to be voluntary manslaughter (or attempted voluntary manslaughter) rather than murder (or attempted murder). (§ 192, subd. (a); *People v. Montes* (2003) 112 Cal.App.4th 1543, 1548.) And a killing (or attempted killing) committed while acting in actual, but unreasonable, self-defense—known as "imperfect self-defense"—may be found to be voluntary manslaughter (or attempted voluntary manslaughter) rather than murder (or attempted murder). (*People v. Breverman, supra*, 19 Cal.4th at p. 163.)

Heat of passion and imperfect self-defense are "theories of partial exculpation" that negate the element of malice, reducing acts that would otherwise establish murder

17

into proof of manslaughter instead. Malice—"a deliberate intention unlawfully to take away the life of a fellow creature"—is an element of the crime of murder. (§ 188; *In re Christian S.*, *supra*, 7 Cal.4th at pp. 778-780.) Attempted manslaughter, like attempted murder, requires proof of an intent to kill; but unlike attempted murder, it requires no proof of malice. (§ 192; *People v. Montes, supra,* 112 Cal.App.4th at pp. 1545-1547.) Therefore by negating the element of malice, murder is reduced to manslaughter, and attempted murder is reduced to attempted manslaughter. (*People v. Rios*, *supra*, 23 Cal.4th at pp. 460-461.) One who intentionally and unlawfully kills or attempts to kill another may lack malice, when he or she acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when he or she kills or attempts to kill in the good faith but objectively unreasonable belief that he or she must act in self-defense. (*People v. Rios*, *supra*, 23 Cal.4th at pp. 460-461, fn. omitted.)

Where there is substantial evidence to support the defendant's guilt of a lesser included offense to the crime charged—in this case, attempted voluntary manslaughter, Sanchez contends—the trial court must instruct the jury on the lesser included offense even in the absence of a request. (*People v. Rountree* (2013) 56 Cal.4th 823, 855.)[4] The trial court's failure to instruct on a lesser included offense is reviewed de novo. (*People v. Licas* (2007) 41 Cal.4th 362, 366.)[5]

The record lacks evidence sufficient to justify consideration of the lesser included offense of attempted voluntary manslaughter, based on either self-defense or heat of passion. Where the defendant's attempt to kill results from a sudden quarrel or acts undertaken in the heat of passion—rashly, without due deliberation and reflection— malice is lacking. The crime then is attempted voluntary manslaughter rather than attempted murder. (*People v. Breverman*, *supra*, 19 Cal.4th at p. 163; *People v. Montes*, *supra*, 112 Cal.App.4th at p. 1548.)

_____

[4] Here, Sanchez requested that the jury be instructed on the lesser included offense of voluntary manslaughter.

[5] For the purpose of this review, we disregard the evidence that conflicts with the appellant's version of the facts.

In order to show voluntary manslaughter under either of these theories, the standard is both subjective and objective. Subjectively, in order to establish the heat of passion required for a showing of voluntary manslaughter the evidence must show that the defendant was actually induced to kill (or to attempt to kill the victim by the victim's provocation. (*People v. Moye* (2009) 47 Cal.4th 537, 540.) And objectively, the evidence must also show that the provocation was of a sort that would be considered sufficient to justify the defendant's response; it must show circumstances "as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from passion rather than from judgment." (*People v. Wickersham* (1982) 32 Cal.3d 307, 326.) Similarly, in order to show voluntary manslaughter due to imperfect self-defense, the evidence must show both that (subjectively) the defendant actually believed that he was in imminent danger of death or great bodily injury, although (objectively) his belief at that time was not reasonably justified. (*People v. Christian S.*, *supra*, 7 Cal.4th at p. 783; *People v. McCoy* (2001) 25 Cal.4th 1111, 1116.)

Sanchez argues that the evidence was sufficient to support a jury determination that both of these elements were established by the evidence, and the jury therefore should have been permitted by appropriate instructions and argument to make that determination. We have concluded in the preceding section of this opinion that the evidence fails to show either that his act of shooting Cortez actually was induced by a fear (whether or not reasonable) of imminent death or great bodily injury from Cortez, and that under Sanchez's own theory of the evidence he would not be entitled to rely on self-defense to justify his conduct. We conclude also that the evidence is not sufficient to support his claim that he shot Cortez acting in the heat of passion.

Sanchez's argument that he acted in the heat of passion begins with the evidence that he and Cortez were involved in an ongoing conflict, in which Cortez had displayed his anger weeks earlier when he told Sanchez to stop calling his underage daughter; that about two weeks before the incident Cortez had threatened to kill Sanchez, prompting Sanchez to leave the jobsite; that he had responded to Cortez's threats, saying that he was not afraid and that they would meet in person; and that when they met unexpectedly at

19

the jobsite the morning of the shooting (and after disclaiming any desire to fight), Sanchez was angered when Cortez again threatened to kill him "because you are worthless" or "worth shit in terms of taking care of your family."

These facts alone could not justify a determination Sanchez later shot Cortez acting in the heat of passion. If Sanchez's version of these events were credited by the jury, it would show that for a number of weeks there had been tension and a heightened emotional state between Sanchez and Cortez, which had been reignited by Cortez's statement the morning of the June 15, 2011 fight. But it does not show that Sanchez was provoked by Cortez's taunts to act out of anger and without deliberation. Sanchez did not even claim that he was.

Nor does Sanchez's version of the remainder of the morning's events satisfy either the subjective or the objective requirements for a voluntary manslaughter instruction based on heat of passion. It was only after he had gotten into his car to drive away after apologizing to Cortez, Sanchez testified, that he was provoked by Cortez's taunts to accede to what he believed was Cortez's challenge to fight. But the taunts and the challenge to fight were not sufficiently provocative to justify a violent response, even in the heat of passion. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826 [voluntary manslaughter instruction not warranted by evidence of provocation by taunting words alone]; *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [reasonable person would not be provoked to killing by taunts that defendant was "a 'mother fucker'"].) According to Sanchez, when he started to drive away Cortez insulted him by saying something like "I thought you really had the balls," (or that he "didn't have the – you know"), and told Sanchez to come with him for what Sanchez believed would be a fight in which "obviously, we were going to kill each other." It was then, he testified, that he felt "sort of provoked" into picking up his gun, getting out of his car, and following Cortez down the hill—but was not provoked at that point to shoot Cortez out of anger or heat of passion.

He testified that after grabbing his gun from the seat of his car, Cortez came at him "as if he was going to come and talk with me"—not as though he was angry, or about to

20

assault him. He did not say that he lifted his gun out of anger or heat of passion or fear because Cortez had threatened him; rather he testified that he "went walking" with Cortez because Cortez had said, "Well, follow me here a little bit." He did not follow Cortez (rather than continuing to drive away) out of heat of passion, but because he accepted what he believed was Cortez's challenge to fight. And when Cortez then started running, Sanchez ran too, "because I didn't want to lose sight of him," rather than because he was too angry to think straight. He was afraid that he might have to defend himself if Cortez were "to grab something, a weapon." Thus even if Cortez's threats and taunts had been objectively sufficient to provoke a reasonable person in Sanchez's position to use deadly force in the heat of passion, nothing in Sanchez's testimony indicates that those threats and taunts actually provoked him to any such response.

Because evidence of the circumstances surrounding Sanchez's shooting of Cortez the first time were not sufficient to support a verdict of voluntary manslaughter on the theories of either heat of passion or self-defense, we need not consider whether after shooting Cortez the first time Sanchez might have been overcome by genuine fear of imminent great bodily injury from Cortez, or might then have been induced by that fear to shoot Cortez repeatedly again while emptying his gun. The fact that he shot with the admitted intention to hit Cortez, without evidence that his shot resulted from heat of passion or a genuine fear of imminent danger, shows attempted murder rather than attempted voluntary manslaughter. If then Sanchez, having shot at Cortez twice hitting him once, Cortez unquestionably was justified in threatening or inflicting bodily harm on Sanchez in order to defend himself; an unreasonable belief on Sanchez's part that he was *then* in imminent danger of harm would not give rise to a right on Sanchez's part to respond with deadly force. (See *People v. Valencia, supra*, 43 Cal.4th at p. 288 ["not every unreasonable belief will support a claim of imperfect self-defense but only one that, if reasonable, would support a claim of perfect self-defense"].) Imperfect self-defense does not apply, and malice is not negated, if the defendant created the circumstances that legally justified the victim's threat of force. (*Ibid.*; *People v. Seaton* (2001) 26 Cal.4th

21

598, 665; *In re Christian S., supra*, 7 Cal.4th at p. 773, fn. 1; *People v. Hardin* (2000) 85 Cal.App.4th 625, 634.)

Sanchez was found guilty of attempted murder for his first shot that hit Cortez, made with deliberation and premeditation. The lesser included offense of voluntary manslaughter based on either imperfect self-defense or heat of passion was inapplicable to that offense, as discussed above. Even if the heat of passion imperfect self-defense theory could apply to Sanchez's final three shots (and there was no evidence that Sanchez acted out of passion or imperfect self-defense in taking those shots) an instruction permitting the jury to apply the theories would not have resulted in a different verdict.

## Conclusion

Sanchez contended in this court that the errors he attributed to the trial court violated California law and infringed upon his rights to a fair trial under the Constitutions of both California and the United States. With respect to sufficiency of the evidence to support his self-defense theory, Sanchez contended that he was prejudiced by the alleged error both under the state-law standard, "and also that the erroneous rulings and failure to instruct denied appellant of his federal constitutional rights to present a complete defense, to due process, to a jury trial, and to a fair trial by a properly instructed jury." He argued that the alleged error "amounted to error of federal constitutional dimension." And he argued that the court's alleged error in failing to submit the lesser included offense of attempted voluntary manslaughter to the jury "resulted in the denial of appellant's federal constitutional rights to due process, to present a defense, to a jury trial, and to a fair trial by a properly instructed jury," and "amounted to a denial of his federal constitutional rights to present a defense, to due process, to a jury trial, and to a fair trial by a properly instructed jury."

For the reasons discussed in this opinion we have concluded that none of Sanchez's contentions entitle him to relief under California law. Our rejection of his claims of error on their merits "necessarily leads to rejection" of the state and federal

constitutional gloss he applies to those errors, requiring "[n]o separate constitutional discussion" in this opinion.  (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

## Disposition

The judgment is affirmed.

NOT TO BE PUBLISHED.


CHANEY, J.


We concur:


ROTHSCHILD, Acting P. J.


JOHNSON, J.