Filed 4/14/15  P. v. Romansky CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B252424 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA090108) |
| v. | |
| JERRY LEE ROMANSKY, | |
| Defendant and Appellant. | |

APPEAL from judgment of the Superior Court of Los Angeles County. Hayden Zackey, Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

Defendant and appellant Jerry Lee Romansky appeals from his second-degree murder conviction (Pen. Code, § 187, subd. (a))[1] after a jury found he fatally stabbed his roommate at Pacifica Hospital of the Valley (Pacifica).[2] Romansky contends the trial court erred when it did not instruct the jury sua sponte on imperfect self-defense and voluntary manslaughter. Specifically, he argues the trial court should have modified its jury instruction on hallucinations (CALCRIM No. 627) to inform the jury that it could consider the delusions he suffered at the time he killed his roommate to find that he acted in imperfect self-defense; a finding that would have reduced the homicide from second-degree murder to voluntary manslaughter. He urges us not to follow *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437 (*Mejia-Lenares*), in which the Fifth District held that imperfect self-defense cannot be based on an insane delusion alone, where the defendant's unreasonable belief that he faces an imminent threat of death or bodily injury finds no basis in the objective facts or circumstances surrounding the killing. (*Id*. at p. 1461.) While this appeal was pending, the California Supreme Court decided *People v. Elmore* (2014) 59 Cal.4th 121 (*Elmore*), in which the court expressly agreed with the Fifth District's reasoning in *Mejia-Lenares* and held that a "defendant may not claim unreasonable self-defense based on insane delusion." (*Id*. at p. 129; see also *id*. at pp. 136-137.) Because Romansky's motivating fear in killing his roommate was based on his own insane delusion with no supporting objective factual basis, we affirm his second-degree murder conviction.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

[2]     Following a bifurcated trial, during which the issue of guilt was tried before a jury and the issue of insanity was tried before the court, Romansky was found legally insane under section 1026 and ordered placed in a mental-health treatment facility for a period not to exceed 31 years to life.

# FACTUAL BACKGROUND

Romansky was admitted to Pacifica's mental-health unit on June 20, 2011. His parents brought him to Pacifica for evaluation and treatment after he had asked his father to shoot him. After being evaluated by Pacifica's staff psychiatrist, Romansky was diagnosed with schizophrenia and determined to be exhibiting altered thought processes that posed a danger to himself and others. According to the staff psychiatrist, Romansky believed someone was trying to poison him, and he heard voices urging him to kill himself and other people. According to his father, Romansky had previously been diagnosed with schizophrenia and bipolar disorder, and he had been involuntarily committed to a psychiatric hospital on approximately nine prior occasions.

Upon his admission to Pacifica, Romansky was assigned to share a room with Dean Camacho, another patient in the hospital's mental-health unit. Although Camacho was "out of control" and aggressive when he was first admitted to Pacifica in March 2011, he had developed into a "very respectful" patient prior to the events leading up to his death. One of Pacifica's nurses testified that she had seen Camacho flirt with other patients and heard him say that he liked both men and women; however, she never saw him try to touch any of the other patients. According to another nurse, Camacho had expressed that he preferred men to women, but he was never sexually aggressive toward other patients at the hospital.

On the evening of June 26, 2011, a nurses' assistant checked on Romansky and Camacho in their room. When the nurses' assistant entered the room, Romansky came out of the restroom cloaked in a blanket. He was sweating and trembling, and he repeatedly asked the assistant for help.

When additional hospital staff members arrived, they found Camacho's body slouched face-down in the restroom stall, with his head and neck resting on the toilet's rim, his back facing away from the toilet, and his pants and underwear pulled down below his buttocks. Camacho's neck had been cut horizontally, and there were approximately 40 to 50 other distinct stab wounds on his neck, one of which had severed

his vertebral artery. The horizontal cut to Camacho's neck had been inflicted postmortem; Camacho had bled to death from the stab wounds to his neck.

While the staff members were responding to Romansky and Camacho's room, Romansky lay down in a prone position on the hallway floor outside the room. He told members of the staff that he had done something bad; that he "did it" because he needed to protect himself and his family. Romansky then reached into his pocket and pulled out a blood-stained metal bracket[3] and several dollar bills.

Romansky was restrained and later interviewed at the hospital by a detective from the Los Angeles Police Department. Although many of his statements were incoherent and non-responsive to the detective's questions, Romansky repeatedly admitted that he had stabbed and killed Camacho.

Romansky provided the detective several different and seemingly unrelated explanations for why he killed Camacho. For example, he said that he had the "green light," and that he had to kill Camacho to protect his mother from the "mafia." He then said that he had been "cornered and [he] couldn't . . . take it no more." However, he did not say who had cornered him. He also said that he did not want to be "the girl" anymore, that he wanted a girlfriend, and that he had been raped by men his whole life. Romansky told the detective that Camacho had been naked in bed with him earlier; however, he told the detective that Camacho did not become angry with him after he told Camacho that he did not want to be the girl anymore. He then said that he had "lost his mind" before he killed Camacho. Finally, he said that his friend, who was a "cholo," told him that if he wanted to be a "G," he could not be lazy. In order to become a "G," Romansky believed he needed to kill Camacho.

After his interview, Romansky was taken into police custody.

---

[3]     The blood covering the metal bracket was later determined to be Camacho's. The bracket had been removed from a box located above the toilet where Camacho's body was found.

## PROCEDURAL BACKGROUND

An information filed on October 14, 2011, charged Romansky with Camacho's murder (§ 187, subd. (a)). The information alleged that Romansky had personally used a deadly weapon, namely an improvised stabbing tool, when he killed Camacho (§ 12022, subd. (b)(1)). The information also alleged Romansky had previously suffered a serious or violent felony conviction (prior-strike allegation) (§§ 667, subd. (b) & 1170.12, subd. (a)). Romansky denied the personal-use and prior-strike allegations and pled not guilty by reason of insanity. The parties stipulated to a bifurcated trial, with the guilt phase to be tried before a jury and the insanity phase to be tried before the court.

During the guilt phase, the trial court instructed the jury that it may consider evidence of Romansky's hallucinations around the time he killed Camacho to determine whether he acted with premeditation and deliberation (CALCRIM No. 627).[4] Romansky did not request, and the trial court did not provide, a modified version of CALCRIM No. 627 informing the jury that it could consider evidence of his hallucinations in determining whether he acted in imperfect self-defense when he killed Camacho.

The jury convicted Romansky of second-degree murder and found true the personal-use allegation. At the sanity phase, two medical experts testified about Romansky's mental-health history and the circumstances surrounding his killing of Camacho. At the conclusion of the sanity phase, the trial court found Romansky legally insane within the meaning of section 1026. The trial court then found true the prior-strike

---

[4]     CALCRIM No. 627 provides: "A hallucination is a perception not based on objective reality. In other words, a person has a hallucination when that person believes that he or she is seeing or hearing [or otherwise perceiving] something that is not actually present or happening. [¶] You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with deliberation and premeditation. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

allegation.  The court ordered Romansky placed in a secure mental-health treatment facility for a period not to exceed 31 years to life.[5]

Romansky timely appealed his conviction.

## DISCUSSION

### I.     Imperfect Self-Defense and Voluntary Manslaughter

Romansky contends the trial court erred when it did not instruct the jury that "hallucinatory thinking" could support a voluntary manslaughter conviction premised on a theory of imperfect self-defense.[6]  Specifically, he argues the jury should have been instructed to consider the honest but irrational fear of great bodily injury he allegedly experienced before he attacked Camacho, a fear that he initially asserted in his opening

---

[5]     The term of 31 years to life was calculated by doubling the 15-years-to-life term required for a second-degree murder conviction (§ 190, subd. (a)) as a result of the trial court's prior strike finding (§ 667, subd. (e)(1)) and adding one year for the jury's personal use of a deadly weapon finding (§ 12022, subd. (b)(1)).

[6]     Acknowledging he did not object to the trial court's instructions below, Romansky argues he did not forfeit a challenge to those instructions on appeal for a number of reasons.  For example, he contends his challenge is preserved under section 1259, which permits an appellate court to review any claim of instructional error that affects a defendant's substantial rights regardless of whether the defendant objected to the alleged error in the trial court.  (§ 1259 ["The appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."]; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.)  He also contends his challenge is preserved because his trial counsel was ineffective for failing to request instructions addressing imperfect self-defense and voluntary manslaughter.

The People do not contend Romansky's claim is forfeited, but take specific issue with Romansky's arguments addressing section 1259 and whether his trial counsel was ineffective.  Because a determination of whether Romansky's substantial rights were affected by the court's alleged error inherently requires an analysis of whether the court's instructions were flawed and, if so, whether that error prejudiced Romansky, we necessarily must reach the merits of his claim here.  Accordingly, we need not and do not address Romansky's arguments that he did not forfeit his claim of instructional error based on other grounds set forth in his opening brief, including whether his trial counsel's alleged ineffective assistance preserved the claim for appeal.  (See *People v. Figueroa* (2008) 162 Cal.App.4th 95, 100, fn. 4.)

brief "could only be explained as the product of a chronically psychotic mind." Conceding that a fear of great bodily injury or death based solely on an insane delusion cannot reduce murder to voluntary manslaughter under a theory of imperfect self-defense (see *Elmore*, *supra*, 59 Cal.4th at pp. 136-137, 145-146; see also *Mejia-Lenares*, *supra*, 135 Cal.App.4th at p. 1461), Romansky argues in his reply brief that his irrational fear of great bodily injury was in fact founded on the objective circumstances surrounding his killing of Camacho. (See *Elmore*, *supra*, 135 Cal.App.4th at p. 146 [evidence of mental disease, defect, or disorder may be used to support a claim of imperfect self-defense where objective circumstances giving rise to the unreasonable belief exist but are distorted by the disease, defect, or disorder].) We disagree.

       *1.*                                     *Applicable Law and Standard of Review*

Under California law, criminal homicide is divided into two major classes: the greater offense of murder and the lesser included offense of manslaughter. (*People v. Rios* (2000) 23 Cal.4th 450, 460.) "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. (§ 188.)

"'A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder.' [Citation.] 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] Thus, the mens rea required for murder is malice, express or implied." (*Elmore*, *supra*, 59 Cal.4th at p. 133.)

Manslaughter, by contrast to murder, is the "unlawful killing of a human being without malice." (§ 192.) Manslaughter is divided into three categories: voluntary, involuntary, and vehicular. (*Ibid*.) A killing perpetrated in imperfect, or unreasonable, self-defense lacks malice and gives rise to criminal liability for voluntary manslaughter. (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) "'[O]ne who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.'

7

[Citation.]" (*Elmore*, *supra*, 59 Cal.4th at p. 134.) Imperfect self-defense is "'not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter.' [Citation.]" (*Ibid*.)

Imperfect self-defense "involves a misperception of objective circumstances, not a reaction produced by mental disturbance alone." (*Elmore*, *supra*, 59 Cal.4th at p. 134.) Accordingly, imperfect self-defense supporting a voluntary manslaughter conviction cannot be based on delusion alone. (*Id*. at p. 146; *Mejia-Lenares*, *supra*, 135 Cal.App.4th at p. 1461.) Rather, a claim of imperfect self-defense where the defendant's honest but irrational perception of imminent harm or death is distorted by his mental illness must be based on a misperception of objective circumstances that actually exist at the time of the killing. (*Elmore*, *supra*, 59 Cal.4th at p. 146 ["[D]efendants who mistakenly believed that actual circumstances required their defensive act may argue they are guilty only of voluntary manslaughter, even if their reaction was distorted by mental illness."].) A defendant who claims he killed in self-defense because of a purely delusional belief that he faced an imminent threat of death of great bodily harm must raise that claim at a sanity trial. (*Ibid*.) "Unreasonable self-defense and legal insanity are distinct theories, and must be adjudicated separately." (*Ibid*.)

Voluntary manslaughter arising out of a killing perpetrated in imperfect self-defense is a lesser offense included in the crime of murder. (*People v. Barton* (1995) 12 Cal.4th 186, 201-202 (*Barton*).) A trial court must instruct on all lesser included offenses supported by substantial evidence. (*People v. Duff* (2014) 58 Cal.4th 527, 561.) "Whenever there is substantial evidence that the defendant killed in unreasonable self-defense, the trial court must instruct on this theory of manslaughter." (*Elmore*, *supra*, 59 Cal.4th at p. 134.) The trial court has no duty to instruct on imperfect self-defense when the evidence suggesting the defendant killed in imperfect self-defense is "minimal or insubstantial." (*Barton*, *supra*, 12 Cal.4th at p. 201.) Substantial evidence is evidence "sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*Id*. at p. 201, fn. 8.)

We review de novo a claim that the trial court erred in failing to instruct on a lesser included offense.  (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

2.                                             *Analysis*

Romansky contends the trial court had a sua sponte duty to instruct on imperfect self-defense, either by modifying CALCRIM No. 627's hallucination instruction or by separately instructing on imperfect self-defense and voluntary manslaughter, because there was evidence of "a lurking homosexual entanglement" preceding his killing of Camacho.  The People contend the trial court had no duty to instruct on imperfect self-defense because Romansky's fear that he needed to defend himself from Camacho was wholly delusional.

Here, the trial court had no duty to instruct the jury on imperfect self-defense.  Although Romansky asserts his motivating fear was based on evidence of a "homosexual entanglement" preceding his attack on Camacho, he cites to no evidence, and we find none in the record, that could provide an objective basis from which an unreasonable fear of imminent death or great bodily injury could be drawn.  (See *Elmore*, *supra*, 59 Cal.4th at p. 134 [although imperfect self-defense involves an unreasonable belief in the need to protect oneself, the belief still must be founded in objective facts or circumstances that could give rise to an actual but unreasonable fear of imminent death or great bodily injury].)  In other words, there is no evidence that Romansky actually perceived an immediate risk of death or great bodily injury when he stabbed and killed Camacho.  (See *id*. at p. 146 ["The jury must find there was an actual, unreasonable belief in the necessity of self-defense based on the circumstances . . . ."].)

Romansky asserts the evidence that Camacho had lain naked in bed with him and his statements to the detective that he had become fed up with being the "girl" demonstrate he felt an "imperative and compelling need to resist Camacho's continual and forceful advances for the last and final time," which constitutes an objective basis supporting his claim of imperfect self-defense.  We disagree.

There is no evidence in the record demonstrating that Camacho may have been forceful with, or aggressive toward, Romansky.  As members of the hospital staff

9

testified, Camacho had not been aggressive toward any of Pacifica's patients during the time shortly before his death. The fact that Camacho had expressed to other patients and staff that he was attracted to men in no way demonstrates, by itself, that he was likely to have been sexually aggressive toward Romansky. In fact, as Romansky told the detective, Camacho did not become angry when he (Romansky) told Camacho that he did not want to be the girl anymore when they were lying in bed together.

Indeed, during the sanity phase, Romansky argued that there was no evidence that his attack on Camacho was sexually motivated. Counsel for Romansky contended that "there's no evidence that Mr. Romansky had homosexual feelings or thoughts or desires," and that even if he had, that theory supports "the idea that he was under a delusion at the time [of the killing]." Romansky's testifying psychiatrist, who interviewed Romansky and reviewed the transcript of the police interrogation, confirmed the lack of evidence to support a theory of imperfect self-defense. The psychiatrist testified: "There is no proof that the guy was forcing [Romansky]. . . . There is no such information from the detective interviews [that Camacho] was forcing him."

In addition, the physical evidence surrounding Camacho's death does not suggest that there was an objective basis for Romansky's perceived threat of death or great bodily harm. Romansky had no defensive wounds or marks on his body, suggesting that he did not struggle with Camacho. Indeed, Camacho's body was found slouched facedown over the toilet, with forty to fifty distinct cuts to his neck, indicating that Romansky had approached Camacho from behind and that there was no struggle between him and Camacho immediately before Camacho's death. This evidence, or lack thereof, when viewed in conjunction with the statements Romansky provided to the detective, demonstrate that any fear he may have experienced before he killed Camacho was detached from reality and based entirely on his insane delusions.

Romansky provided several different explanations for why he attacked Camacho, but none of these explanations involved any circumstances that, if based on actual, objective facts existing at the time he stabbed and killed Camacho, would support a claim of imperfect self-defense. For example, Romansky told the officer that he believed he

10

needed to kill Camacho to protect his mother from the mafia. However, there was no evidence that Camacho, or any other person close to Romansky at the time of Camacho's death, was involved in the mafia or had threatened Romansky or his mother.[7] Romansky also told the officer that he had been instructed by a friend to kill Camacho to prove that he was a "G." Even if this explanation was founded in objectivity, it would not support a claim for imperfect self-defense because it could not give rise to an unreasonable belief that Romansky faced a threat of imminent death or harm at the time he killed Camacho. Finally, although Romansky also told the detective that he killed Camacho because he felt "cornered," he did not state that he felt cornered by Camacho immediately before the attack. (See *Elmore*, *supra*, 59 Cal.4th at p. 146 [actual but unreasonable fear of imminent threat must be based on the objective circumstances existing at the time of the killing].) As Romansky's opening brief acknowledges, at the time he killed Camacho, Romansky was "suffering from hallucinatory and delusional thinking," and his beliefs, even if honest, were "all irrational."

In light of the foregoing, we reject Romansky's claim that he killed Camacho in imperfect self-defense because any threat he may have perceived was entirely delusional. (*Elmore*, *supra*, 59 Cal.4th at p. 134.) The trial court therefore had no duty to instruct on imperfect self-defense and voluntary manslaughter. (See *ibid*; see also *Barton*, *supra*, 12 Cal.4th at p. 201.)

## II. The Trial Court's Prior-Strike Finding Is Supported by Substantial Evidence

Romansky next contends the trial court's prior-strike finding is not supported by substantial evidence, and the People agree. Both parties are incorrect.

Section 1192.7 defines what crimes constitute serious felonies, or strikes, for purposes of imposing sentencing enhancements for prior-strike convictions. (See § 667, subd. (a)(4).) In 2000, California voters passed Proposition 21, which added as a

---

[7]     Romansky's father testified that Romansky was never involved with gangs or other forms of organized crime, and that he merely had an interest in learning about the mafia and gangs and would often watch television shows and movies involving such topics.

separately cognizable serious felony:  "assault with a deadly weapon, firearm, machinegun, assault weapon, or semiautomatic firearm or assault on a peace officer or firefighter, in violation of Section 245."  (§ 1192.7, subd. (c)(31); see also Ballot Pamp., Primary Elec. (Mar 7, 2000) text of Prop. 21, § 17, pp. 124-125.)  Following section 1192.7's amendment by Proposition 21, "[a] conviction for assault *with a deadly weapon* under section 245, subdivision (a)(1) now qualifies as a serious felony whether or not the defendant was convicted as a direct perpetrator or as an aider and abettor."  (*People v. Banuelos* (2005) 130 Cal.App.4th 601, 605 (*Banuelos*), italics original.)

To prove a prior conviction, the prosecutor may introduce official court records from the prior conviction's proceedings, including, among other things, the criminal complaint, certified copies of the court's minute orders, and certified copies of the abstract of judgment.  (*People v. Delgado* (2008) 43 Cal.4th 1059, 1066 (*Delgado*); *People v. Henley* (1999) 72 Cal.App.4th 555, 559-560.)  "'[The] trier of fact is entitled to draw reasonable inferences from certified records offered to prove a defendant suffered a prior conviction. . . .' [Citation.]  '[O]fficial government records clearly describing a prior conviction presumptively establish that the conviction in fact occurred, assuming those records meet the threshold standards of admissibility.  [Citation.]  Some evidence must rebut this presumption before the authenticity, accuracy, or sufficiency of the prior conviction records can be called into question.'  [Citation.]"  (*Delgado*, *supra*, 43 Cal.4th at p. 1066.)

The trial court found Romansky previously suffered a prior-strike conviction in 2009, after he pled no contest to a charge of assault with a deadly weapon, namely a knife (former § 245, subd. (a)(1) [amended by Stats. 2011, c. 183 (A.B.1026), § 1).  The court based its finding on the court's file from Romansky's prior assault conviction, a certified minute order from the hearing at which Romansky entered his no contest plea to the assault charge, and Romansky's booking photograph from his arrest on the assault charge.  In reaching its finding, the court stated the following: "The court has reviewed the certified minute order . . . .  The court has also reviewed . . . a booking photograph of Mr. Romansky . . . .  I am also looking at the court file.  The minute order does reflect

that Mr. Romansky was convicted of Count 1, a violation of [section 245, subdivision (a)(1)]. And looking at the complaint and the court file that the court has, the court notes that Count 1 is a . . . serious felony and, thus, is a strike. The court, therefore, will find the prior strike [allegation] to be true within the meaning of [section] 1170.12, [subdivisions] (a) through (d), and [section] 667, [subdivisions] (b) through (i)."

Romansky and the People assert that insufficient evidence supports the trial court's prior-strike finding because the record of Romansky's prior conviction does not disclose that Romansky directly perpetrated, as opposed to aided and abetted, the assault. Both parties erroneously rely on the law interpreting prior-strike findings based on convictions for assault under former section 245, subdivision (a)(1) that predates Proposition 21's amendment of section 1192.7. Prior to that statute's amendment, a violation of section 245, subdivision (a)(1) did not qualify as a serious felony under section 1192.7 unless the defendant personally used a deadly weapon or personally inflicted great bodily harm. (See *People v. Rodriguez* (1998) 17 Cal.4th 253, 261 (*Rodriguez*) [evidence of a conviction under section 245, subdivision (a)(1), standing alone, is insufficient to prove the defendant was convicted of a "serious" felony].) However, as noted, following Proposition 21's amendment of section 1192.7, assault with a deadly weapon under section 245, subdivision (a)(1) constitutes a serious felony and, consequently, a strike offense, regardless of whether the defendant aided and abetted the assault or personally used the deadly weapon in committing the assault. (*Delgado*, *supra*, 43 Cal.4th at p. 1065 ["'[A]ssault with a deadly weapon' is a serious felony."]; see also *Banuelos*, *supra*, 130 Cal.App.4th at p. 605.)

Here, sufficient evidence supports the trial court's prior-strike finding. The criminal complaint filed in Romansky's prior assault case states that Romansky was charged under former section 245, subdivision (a)(1) with assault with a deadly weapon, namely a knife. A minute order from one of the trial court's hearings held several weeks after the complaint was filed states that Romansky was charged with "ASSAULT W DEADLY WEAPON/INSTR." In addition, at the hearing at which Romansky pled no

contest to the assault charge, the following exchange occurred between the court, Romansky, and his counsel:

> The Court: With all that [in] mind, how do you plead in count 1 to a violation of Penal Code section 245(a)(1), assault with a deadly weapon, a knife, on July 3rd, 2008? Guilty, not guilty or no contest?
>
> [Romansky]: No contest.
>
>            ***
>
> The Court: [D]o you understand this is a strike offense[?] If you pick up another felony in the future, this offense could be used to double your sentence in the next case. Do you understand that?
>
> [Romansky]: Yes.
>
> The Court: All right. Counsel join in the plea and waivers, stipulate to a factual basis based on the probation report?
>
> [Romansky's Counsel]: Join and stipulate.

At the sentencing hearing in this case, Romansky presented no evidence to rebut the presumption that the records contained in his prior-conviction case file established that his prior conviction for assault was a serious felony that qualified as a strike. (See *Delgado*, *supra*, 43 Cal.4th at p. 1066 ["[I]f the prosecution presents, by [certified record from the trial court], prima facie evidence of a prior conviction that satisfies the recidivist enhancement at issue, and if there is no contrary evidence, the fact finder, utilizing the official duty presumption, may determine that a qualifying conviction occurred."].) Because those records constitute prima facie evidence of a prior conviction for a serious felony (i.e., assault with a deadly weapon in violation of former section 245, subdivision (a)(1)), the trial court did not err in finding that the conviction qualified as a serious felony for sentencing purposes.

14

## DISPOSITION

The judgment is affirmed.

IWASAKI, J.[*]

**We concur:**

**PERLUSS, P. J.**                              **ZELON, J.**

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.